**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**DAVENPORT DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY** | § | |
| **COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.** |
| | § | **3:11-cv-00041-CRW-TJS** |
| | § | |
| | § | |
| **HILL COUNTRY FARMS, INC., d/b/a** | § | |
| **HENRY'S TURKEY SERVICE** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |
| _____ | § | |

**EEOC'S BRIEF IN SUPPORT OF MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**
**ON WAGE ISSUES**

Table of Contents

I.   Summary Judgment Standard……………………………………………….3

II.   Statement of the Matter with Background………………………………..4

III.  Legal Argument……………………………………………………………...7

A.  Hill Country Farms, Inc. d/b/a Henry's Turkey Service ("HCF/HTS") is collaterally estopped from forwarding a defense to the government's claims that the Defendant paid unlawfully low wages to persons identified as victims in the EEOC's suit…..7

B.  Even if this Court does not rely upon or apply the findings in other proceedings as having a preclusive effect on HCF/HTS's defense against wage violations, evidence developed in the instant case and incorporated from

1

other proceedings supports a finding that the persons identified as victims by the EEOC, were paid unlawfully low wages.........11

C.  Defendant is an employer of all the individuals listed in EEOC's Amended Statement of Interest filed with the ADA Complaint.  HCF/HTS is an employer as contemplated by the labor and employment laws of the United States. . ..…..12

D.  Defendant is liable for wages due the identified workers in accordance with the applicable federal and Iowa state minimum wage rate for the entire two-year period from February 2007 to February 2009. ….. 17

E.  Defendant cannot avail itself of minimum wage credits pursuant to 29 U.S.C. § 203(m)("Section 3(m)") of the  Fair Labor Standards Act ("FLSA") to supplement the actual wages of $65.00 per month paid to the disabled workers…..25

     1.  The disabled workers, not HCF/HTS, paid expenses claimed as Section 3(m) credits.  Employees' personal Social Security and SSI funds were used for expenses claimed to have been incurred by HCF/HTS…….25

     2.  Section 3(m) credits claimed by HCF/HTS were unsupported based on applicable FLSA regulations which require that costs be incurred for the benefit of the employee, and documented with specific accounting…..28

F.  Defendant's reason for paying some of their workers less than federal or state minimum wage rates was because of the intellectual disabilities of the employees as established by Defendant's admissions and evidence of financial exploitation…34

     1.  The proper measure of make-whole damages for lost wages to be paid by the Defendant to the  identified disabled workers if disability discrimination is proved on summary judgment or at trial, is an equivalent wage rate as that paid to non-disabled workers at the West Liberty Foods plant with similar job positions/categories and tenure…38

IV. Conclusion………..41

2

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ricci v. DeStefano* 129 S. Ct. 2658 (2009) .........................................................3

*Albermarle Paper Co. v. Moody*, 422 U.S. 405 (1975) ....................................39

*Amir v. St. Louis University*, 184 F.3d 1017 (8th Cir. 1999) ...........................36

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................3

    *Id.* at 248 ...............................................................................................3

    *Anderson*, 477 U.S. at 250 ..................................................................3

*Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311 (8th Cir. 1996) ....................36

*Bailey v. Pilots Association*, 406 F. Supp. 1302 (E.D.Pa. 1976) ......................30

*Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500 (11th Cir. 1993) ......................29

*Castillo v. Case Farms of Ohio, Inc.*, 94 F. Supp. 2d 578 (W.D. Tex. 1999) .................30

*Celotex Corp. Catrett*, 477 U.S. 317 (1986) ......................................................3

*Chao v. Barbeque Ventures, LLC*, 547 F.3d 938 (8th Cir. 2008) .......................3

*Coleman v. City of Omaha*, 714 F.2d 804 (8th Cir. 1983), *citing Albermarle, supra,* at 421................................................................................................39

    *id* ..........................................................................................................39

*Donovan v. Brown Equipment and Service Tools, Inc.*, 666 F.2d 148 (5th Cir. 1982) ................................................................................................34

*Donovan v. Williams Chemical Co., Inc.*, 682 F.2d 185 (8th Cir. 1982)...........29

    *Donovan v. Williams Chemical Co., Inc.*, 682 F.2d 185 (8th Cir. 1982)....................31

    *Donovan v. Williams Chemical Co, Inc.*, 682 F.2d 185 (8th Cir. 1982)....................33

*Dyer v. Hinky Dinky, Inc.*, 710 F.2d 1348 (8th Cir. 1983) ...............................38

*Goldberg v. Whitaker*, 366 U.S. 28 (1961) ......................................................13

*Haberer v. Woodbury County*, 188 F.3d 957 (8th Cir. 1999)..............................9

*Hodgson v. Jones*, 453 F.2d 515 (8th Cir. 1971) ...............................................34

*Johnson v. City of Columbia, S.C.*, 949 F.2d 127 (4th Cir. 1991) .....................34

*Leonard v. Southwestern Bell Corp. Disability Income Plan*, 341 F.3d 696 (8th
      Cir. 2003) .................................................................................................9

*Liberty Mutual Insurance Co. v. Fag Bearings Corp.*, 335 F.3d 752...................9

*Marshall v. Truman Arnold Distribution Co., Inc.*, 640 F.2d 906 (8th Cir. 1981)...........30

*Matsushita Electric Industrial Co. v. Zeneth Radio Corp.*, 475 U.S. 574 (1986) ..............3

*New Hampshire v. Maine*, 532 U.S. 742.............................................................7

*New Hampshire*, 532 U.S. at n. 16....................................................................8

*Osias v. Marc*, 700 F. Supp. 842 (D. Md. 1988) ...............................................31

*Parklane Hosiery v. Shore*, 439 U.S. 322 (1979) ...............................................8

      *Id.* at 652     ................................................................................................8

*Reich v. Parker Fire Protection District*, 992 F.2d 1023 (10th Cir. 1993) .......12

*Rensink v. Wells Dairy, Inc.*, 741 F. Supp. 2d 1038 (N.D. Iowa 2010)............35

*Smith v. World Insurance Co.*, 38 F.3d 1456 (8th Cir. 1994)............................39

*Soler v. G U Inc.*, 833 F.2d 1104 (2d Cir. 1987), *cert. denied,* 488 U.S. 832
      (1988)........................................................................................................30

*Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d 1105 (S.D. Iowa 2011), *aff'd,*
      No. 11-3069, 2012 WL 1674176 (8th Cir. 2012). (attached for the Court's
      convenience, at App 1-21) ........................................................................7

      *Solis v. Hill Country Farms, Inc*, 808 F. Supp. 2d 1105 (S.D.Iowa, 2011)................10

      *Solis v. Hill Country Farms, Inc., Civil Action Number
      3:09:-cv-00162-HDV-RAW*, 808 F. Supp. 2d 1105 (S.D. Iowa 2011), *aff'd,*
      No. 11-3069, 2012 WL 1674176 (8th Cir. 2012) ........................................12

      *Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d at 1105........................16

*Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d 1105 (2011) ................................19

*Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d 1105 (S.D. Iowa 2011),
*aff'd*, No. 11-3069, 2012 WL 1674176 (8th Cir. 2012). (McGhee Declaration,
App.583-587) ................................................................................................22

*Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d at 1108-1109 ..............................16

*Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d at 1112........................................20

*Taylor v. Nimock's Oil Co.*, 214 F.3d 957 (8th Cir. 2000)..................................35

*Walsted v. Woodbury County, Iowa*, 113 F. Supp. 2d 1318 (N.D. Iowa 2000)................35

*Id.* at 1328-1329 ..............................................................35

*Webb v. Garelick Manufacturing Co.*, 94 F.3d 484 (8th Cir. 1996)..................................35

## STATE CASES

1996 WL 1005231 ..........................................................................30

*Dettmann v. Kruckenberg*, 613 N.W.2d 238 (Iowa 2000)..................................9

*Id.* at 244 ..........................................................................9

*id* ..........................................................................9

*Marshall v. Bernard Debord* (E.D. Okla. 1978) 1978 WL 17055, *citing Masters
v. Maryland Management Co.*, 493 F.2d 1329 (4th Cir. 1974) ..................................30

## DOCKETED CASES

*In the Matter of Henry and Johnson d/b/a Hill Country Farms and Henry's
Turkey Service v. Iowa Department of Workforce Development, Division of
Labor Services*, IWD No. CP-003-09/DIA (App 36-55)..........................................6

*In the Matter of Henry and Johnson d/b/a Hill Country Farms and Henry's
Turkey Service v. Iowa Department of Workforce Development, Division of
Labor Services*, IWD No. CP-003-09/DIA ..................................................12

*In the Matter of Henry and Johnson d/b/a Hill Country Farms and Henry's
Turkey Service v. Iowa Department of Workforce Development, Division of
Labor Services*, IWD No. CP-003-09/DIA (App. 36-55)..........................................23

**FEDERAL STATUTES**

42 U.S.C. § 12111(5)(A)..................................................................................................12

42 U.S.C. §12112(a) ......................................................................................................24

    42 U.S.C. Sec. 12112(a) ..........................................................................................34

    42 U.S.C. §12112(a) ................................................................................................37

42 U.S.C. §12117(a) ........................................................................................................4

42 U.S.C. §706(g)(1) .......................................................................................................4

42 U.S.C. Sec. 12101(b)(1).............................................................................................35

42 U.S.C. Sec. 12102(A) .................................................................................................35

29 C.F.R. § 516.27(b) ......................................................................................................33

29 C.F.R. §525.9 ..............................................................................................................23

29 C.F.R. 531.3(d) ...........................................................................................................27

    29 C.F.R. 531.3(d) ..................................................................................................29

29 C.F.R. Sec. 1630.2(1)..................................................................................................36

29 C.F.R. Sec. 1630.2(h).................................................................................................35

29 C.F.R. Sec. 1630.2(i) .................................................................................................36

29 U.S.C. § 203(d) ..........................................................................................................12

29 U.S.C. § 203(m)("Section 3(m)") ...............................................................................2

    29 U.S.C. §203(m)..................................................................................................10

    29 U.S.C. § 203(m) ................................................................................................25

    29 U.S.C. § 203(m) ................................................................................................25

    29 U.S.C. 203(m) ...................................................................................................29

    *Id.* at §531.3(b)......................................................................................................29

*Id.* at § 516.27(a) .......................................................................................29

*Id.* at § 516.27(b) .......................................................................................29

29 U.S.C. 203(m) .......................................................................................30

29 U.S.C. §203(m) .......................................................................................32

29 U.S.C. § 203(m) .......................................................................................33

29 U.S.C. § 206 .......................................................................................18

29 U.S.C. § 206 .......................................................................................18

29 U.S.C. §206(2012) .......................................................................................18

29 U.S.C. §214(c) .......................................................................................10

29 U.S.C. §214(c) .......................................................................................36

29 U.S.C.A. §206 .......................................................................................18

ADA, 42 U.S.C. §12111(5) .......................................................................................13

FLSA, 29 C.F.R. § 516.27 .......................................................................................32

FLSA, 29 U.S.C.A. §214(c) .......................................................................................23

Fed.R.Civ.P. 1 .......................................................................................3

Pub. L. No. 110-325, 122 Stat. 3553 (2008) .......................................................................................35

Regulation 29 C.F.R. §531.31 .......................................................................................31

## STATE STATUTES

2011 Iowa Code, Title III .......................................................................................18

Iowa Code Chapter 91D .......................................................................................6

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment is not a disfavored procedural shortcut, but an integral part of the Federal Rules.  *See Celotex Corp. Catrett*, 477 U.S. 317, 327 (1986) (noting that summary judgment was designed "to secure the just, speedy and inexpensive determination of every action," citing Fed.R.Civ.P. 1).  However, not every factual dispute between the parties will prevent summary judgment.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  A genuine issue of material fact exists only if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party.  *Id.* at 248; *Chao v. Barbeque Ventures, LLC,* 547 F.3d 938, 941 (8th Cir. 2008).  If the party seeking summary judgment meets its initial burden, then the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson,* 477 U.S. at 250. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of fact for trial." *Ricci v. DeStefano*, ___U.S.___; 129 S.Ct. 2658, 2677 (2009) quoting *Matsushita Elec. Indus. Co. v. Zeneth Radio Corp.* 475 U.S. 574, 587 (1986)).

3

## II. Statement of the Matter

Plaintiff, United States Equal Employment Opportunity Commission ("EEOC"), filed this federal statutory discrimination suit pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12117(a).   The suit is brought on behalf of the public interest and seeking remedy and relief for Charging Party James Keith Brown and 31 other intellectually-disabled men who worked for the Defendant in the State of Iowa for over three decades.  As  part of its claims set forth in the Complaint filed on April 6, 2011, (Court Dkt. No. 1), EEOC seeks to recover unpaid wages from Defendant Hill Country Farms, Inc. d/b/a Henry's Turkey Service ("HCF/HTS") for a period of approximately two years prior to the time that the disabled workers were removed from the custody and control of the employer and that the disability discrimination charge of James Keith Brown was filed with the EEOC in February 2009.  42 U.S.C. §706(g)(1). (EEOC Undisputed Material Fact ("EEOC UMF") No. 1).

Background Facts

In the mid-1960's, Hill Country Farms, a for-profit corporation with its principal business located in Goldthwaite, Texas, began working with disabled men in a variety of agricultural activities. (EEOC UMF No. 2)   In 1972, Kenneth Henry, the owner of Henry's Turkey Services, Inc., and T.H. Johnson, jointly incorporated as Hill Country Farms, Inc. d/b/a Henry's Turkey Services.  Defendant uses the names "Hill Country Farms" and "Henry's Turkey Service" interchangeably. (EEOC UMF No. 3)

By the late 1970's, HCF/HTS began contracting with a turkey processing plant located in West Liberty, Iowa to provide the disabled men as workers on the plant's turkey processing line. (EEOC UMF No. 4)  From at least 2006 until February 7, 2009, the HCF/HTS disabled employees worked on the processing line, commingled with the plant's non-disabled employees.

4

(EEOC UMF No. 5)  During the entire period they worked at the plant, the HCF/HTS employees were housed in a converted schoolhouse, known as "the Bunkhouse," in Atalissa, Iowa, a few miles down the road from. the plant where they worked in West Liberty, Iowa.  HCF/HTS had the disabled men quartered in the Bunkhouse until February of 2009, when it was shut down by the State of Iowa and the disabled men were removed. (EEOC UMF No. 6)

For more than 30 years during which the disabled men were employed in Iowa, all of them were always paid in the same manner, using the same calculation method, a cash payment of $65.00 per month. (EEOC UMF No. 7)  HCF/HTS alleges that the disabled men were paid enough to constitute a legal minimum wage when the $65.00 per month was combined with provided "room and board" and "in kind care," which the Defendant urges should be credited toward the wages.  (EEOC UMF No. 8)

All of the employees for whom the EEOC is seeking back wages received monthly deposits of Social Security and/or Supplemental Security Income ("SS and "SSI") into their individual bank accounts located at Mills County State Bank in Goldthwaite, Texas. (EEOC UMF No. 9)  The defendant corporation, through its officer Jane Ann Johnson, was listed as the Designated Representative Payee on these accounts, with total control over the money in the accounts. (EEOC UMF No. 10)  According to HCF/HTS, these SS and SSI funds were represented by HCF/HTS to have been used to "reimburse" the company for expenses the Defendant claims to have incurred by providing "board, lodging and other facilities" to the disabled employees. (EEOC UMF No. 11)

HCF's business activities in Iowa had been investigated previously by the United States Department of Labor's Wage and Hour Division ("DOL/WHD"), including an investigation which concluded in 2003. (EEOC UMF No. 12)  The DOL/WHD determined that HCF/HTS had

violated the FLSA and instructed HCF/HTS regarding minimum wages, overtime, Section 3(m)

credit and record keeping; however, despite the knowledge of these violations, and an agreement

to comply with the wage laws, HCF/HTS never changed its pay practices. (EEOC UMF No. 13)

Given that the wage violations continued by HCF/HTS, the EEOC seeks to secure monetary

remedy for the unlawfully unpaid back wages earned by the disabled employees for the period

from February 24, 2007, through February 6, 2009.

     Closely Related Litigation

     Within 30 days on either side of the EEOC filing of the instant suit on April 6, 2011, two

separate civil proceedings related to unlawful pay practices, which had been brought against this

same Defendant, HCF/HTS, resulted in rulings in favor of the disabled workers and against

HCF/HTS as the employer in both state and federal fora.

     First, on March 8, 2011, Commissioner Christopher James Godfrey for the Iowa

Department of Workforce Development, Division of Labor, issued a Final Agency Decision

determined, among other findings, that:

- Hill Country Farms, Inc., Kenneth Henry and Jane Ann Johnson were liable for violations as joint employers;
- HCF/HTS had failed to pay the minimum wage in violation of Iowa Code Chapter 91D;
- HCF/HTS made improper wage deductions for room and board in violation of Iowa law; and
- HCF/HTS made improper wage deductions for "kind care" in violation of Iowa law.[1]

*In the Matter of Henry and Johnson d/b/a Hill Country Farms and Henry's Turkey Service v.*

*Iowa Department of Workforce Development, Division of Labor Services*, IWD No. CP-003-

09/DIA No. 09IWD030,  (App 36-55).  The Final Agency Decision was appealed by HCF/HTS,

but was upheld on a Petition for Judicial Review rendered by the Iowa State District Court for

---

[1] Penalties were assessed in the amount of $1,164,400 with no penalty reduction to be applied.

the Fifth Judicial District in *Henry et al. v. Iowa Dep't of Workforce Dev.,* No. CV8615, (Dist.Ct.

Sept. 9, 2011)(*unpublished*) ("*Henry v. IDWD*"), (App 22-35).

Also, just weeks after EEOC filed its own civil enforcement action, Judge Harold D.

Vietor, for the United States District Court for the Southern District of Iowa, Davenport

Division, issued a decision granting a plaintiff's motion for partial summary judgment in a civil

action brought by the U.S. Department of Labor, *Solis v. Hill Country Farms, Inc.*, 808

F.Supp.2d 1105 (S.D. Iowa 2011), *aff'd*, No. 11-3069, 2012 WL 1674176 (8th Cir. 2012).

(attached for the Court's convenience, at App 1-21).

### III.   Legal Argument

**A.   Hill Country Farms, Inc. d/b/a Henry's Turkey Service ("HCF/HTS") is collaterally estopped from forwarding a defense to the government's claims that the Defendant paid unlawfully low wages to persons identified as victims in the EEOC's suit.**

The common law doctrines of *res judicata* and collateral estoppel stem from Art. IV,

Sect. 1 of the Constitution, the Full Faith and Credit Clause. The Supreme Court has stated that

"This statute has long been understood to encompass the doctrines of *res judicata*, or "claim

preclusion," and collateral estoppel, "issue preclusion." *San Remo Hotel v. San Francisco*, 545

U.S. 323, 336 (2005).

> Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. <u>Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or different claim.</u>

*New Hampshire v. Maine,* 532 U.S. 742, 748-49. (2001) (emphasis added)

Further, pursuant to the legal doctrine of collateral estoppel/issue preclusion, "once a

court has decided an issue or fact or law necessary to its judgment, that decision may preclude

relitigation of the issue in a suit on a different cause of action involving a party to the first case."
*New Hampshire*, 532 U.S. at n. 16.

Mutuality is not a requirement for issue preclusion, however, there are certain elements that must be met in order for a non-mutual party to invoke the doctrine. *Parklane Hosiery v. Shore,* 439 U.S. 322 (1979). The U.S. Supreme Court has granted broad discretion to the trial courts to determine when the doctrine may be applied, stating that, "[t] he general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Id.* at 652. This particular case, involving claims of wage violations against HCF/HTS, however, presents a model example for why the general presumption would not apply. Concerns regarding "fairness" are simply not raised by the EEOC suit against HCF/HTS, because the Defendant is in no way surprised or otherwise prejudiced by being precluded from relitigating wage violation claims already fully presented and decided in both a federal and state judicial and administrative proceedings. The undisputed facts presented in the EEOC's case, very closely mirror the core material facts set forth in the DOL's prior suit, *Solis v. Hill Country Farms,* the vast majority of which were actually admitted by the Defendant HCF/HTS in its Response to (DOL's) Statement of Uncontroverted Material Facts, (Crt. Dkt. No. 11)[2] ("HCF RSOF") (App. 77-83). The Defendant raised little, if any resistance to the DOL Statement of Uncontroverted Material Facts (Ct.Dkt. No. 7), ("DOL SOF")(App. 56-76). The only difference in relief sought by the EEOC in this Motion for Partial Summary Judgment, as compared with the action brought

---

[2]  100 of 116 of the Department of Labor's uncontroverted facts were admitted directly by HCF/HTS. Only 1 of the 116 facts was denied; 5 others were simply clarified)

by DOL is with respect to alternative calculations of the amount of back wages for monetary relief, based on pay rates which may exceed the federal minimum wage.

The Eighth Circuit has held that <u>issue</u> <u>preclusion</u> <u>applies</u> " when the party against whom preclusion is sought, was involved in a prior lawsuit" and (1) the issue was the same in the prior case, (2) the issue was actually litigated in the prior case, (3) the issue was determined by a valid, final judgment, and (4) the determination of the issue was essential in the prior litigation. *Leonard v. Southwestern Bell Corp. Disability Income Plan,* 341 F.3d 696, 701 (8th Cir. 2003). With regard to (2) above, the circuit has stated that fulfilling this element allows for "a prior judgment to preclude relitigation of an issue even though the party asserting collateral estoppel was not a party to the prior case." *Liberty Mutual Ins. Co. v. Fag Bearings Corp*. 335 F.3d 752, 758-59, quoting *Accord Haberer v. Woodbury County,* 188 F. 3d 957, 963 (8th Cir. 1999).

Although the present case brought by the EEOC is not a diversity case, but filed pursuant to federal statutory authority, it may be instructive to look to the law of Iowa on the subject of collateral estoppel based on issue or claim preclusion.  The Supreme Court of Iowa considered the doctrine of issue preclusion in *Dettmann v. Kruckenberg,* 613 N.W. 2d 238 (Iowa 2000). The Court analogized the use of issue preclusion by a non- mutual plaintiff against a defendant to the use of a sword and laid out the elements as follows: "(1) the issue determined in the prior action is identical to the present issue; (2) the issue was raised and litigated in the prior action; (3) the issue was material and relevant to the disposition in the prior action; (4) the determination made of the issue in the prior action was necessary and essential to that resulting judgment." *Id.* at 244. There is an additional requirement discussed: that either the two parties must be the same as in the prior action, or there is privity between the party against which issue preclusion is being sought and the party against whom the issue was determined in the prior case. *Id.*

9

While state law is not controlling here, the Iowa Supreme Court's analysis is consistent with the EEOC's argument as to the reasons for which issue preclusion should be applied based on prior findings of violations with regard to unlawfully unpaid wages to the disabled employees of HCF/HTS.  In the present case, preclusion of  the relitigation of claims/defenses/issues can and should be used against the Defendant with respect to whether HCF/HTS paid its disabled workers lower wages than required by law, as was determined by the federal district court in the DOL's case, *Solis v. Hill Country Farms, Inc*, 808 F.Supp.2d 1105 (S.D.Iowa, 2011)[3]  Privity, of course, is not a matter requiring examination in this case, because HCF/HTS is the identical party against whom the prior judgment was entered and the issue determined.

The first element of the preclusion analysis is met because the district court found, and the appellate court affirmed, that the disabled workers were inadequately compensated in violation of federal law, and more specifically, in violation of FLSA wage requirements. Second, this issue was raised and litigated in the previous case. In fact, the unlawful payment of wages issue was the central subject of the DOL case, which sought payment of the back-owed minimum wages and overtime for these violations. Similarly, this issue was clearly material and relevant to the disposition in the prior case. The unlawful pay practices were at the very heart of the litigation in the case of *Solis v. Hill Country Farms*.  Furthermore, defenses attempting to rely on a 29 U.S.C. §214(c) certification exception or for 29 U.S.C. §203(m) credits, were also material and relevant in the prior case, as the court would not have been able to find a willful violation if it had not first determined, as a matter of law, that HCF/HTS could not substantiate

---

[3]  Although the decision in *Solis v. Hill Country Farms*  was appealed by HCF/HTS to the Eighth Circuit Court of Appeals and was affirmed  on May 14, 2012, the Defendant/Appellant did not challenge the findings of the District Court's with regard to the back wages owed and awarded as a result of minimum wage and overtime violations, all as assessed  and calculated by the Department of Labor Wage and Hour Division.  The only issue on appeal was whether HCF/HTS was an "employer".  Therefore, findings and conclusions by the U.S. District Court regarding the non-crediting of defenses raised to justify HCF/HTS pay practices have not been challenged after disposition of the summary judgment in District Court case.

3(m) credits and did not have DOL's approval for operating under a 14(c) certificate.  These issues were also raised and litigated in the prior case, and were fully heard in Iowa State administrative proceedings.  The determinations that HCF/HTS paid the workers less than required under the FLSA were both necessary and essential to the findings made in the *Solis v. Hill Country Farms*, decided April 21, 2011, (appended for the Court's convenience, at App. 1-21).  Accordingly, all the elements are met for claim preclusion to be asserted here so that the Defendant does not once again relitigate matters and reiterate defenses that have already been fully litigated and judicially determined.  Collateral estoppel  is appropriate on the defenses to the wage violations.

> **B. Even if this Court does not rely upon the findings in other proceedings as having a preclusive effect on HCF/HTS's defenses against wage violations, evidence developed in the instant case and incorporated from other proceedings supports a finding that the persons identified as victims by the EEOC, were paid unlawfully low wages.**

If this District Court should decide that collateral estoppel should not be applied against the Defendants for wage violation issues based on the legal doctrine of issue preclusion, the EEOC forwards this Motion for Partial Summary Judgment to present not only the evidence developed not only through the EEOC's investigation and discovery of the instant case, but also through the incorporation of all evidence which is considered admissible as part of a public record in prior proceedings, as sworn admissions against interest, as testimony given under oath in another proceeding, as business records, and as may otherwise be deemed admissible evidence in these proceedings.  The EEOC will reference such relevant evidence from other federal or state proceedings as corroborating or supplementing the evidence and legal arguments being forwarded by the EEOC in this motion for partial summary judgment.  The primary sources of evidence upon which the EEOC will rely from other proceedings will be: the record in the case

proceedings of *Solis v. Hill Country Farms, Inc., Civil Action No. 3:09:-cv-00162-HDV-RAW,*

808 F.Supp.2d 1105 (S.D. Iowa 2011), *aff'd,* No. 11-3069, 2012 WL 1674176 (8th Cir. 2012);

and the record from proceedings, *In the Matter of Henry and Johnson d/b/a Hill Country Farms*

*and Henry's Turkey Service v. Iowa Department of Workforce Development, Division of Labor*

*Services*, IWD No. CP-003-09/DIA No. 09IWD030.

Evidence from prior proceedings, together with the evidence submitted from EEOC's

independent investigation and discovery, will amply meet the summary judgment standard

establishing the unlawful and discriminatory wage disparity claims alleged by the EEOC.

**C. Defendant is an employer of all the individuals listed in EEOC's Amended**
**Statement of Interest filed with the ADA Complaint.  Hill Country Farms is an**
**employer as contemplated by the labor and employment laws of the United**
**States.**

The term "employer" under the Americans with Disabilities Act ("ADA")

> "…means a person engaged in an industry affecting commerce who has 15 or
> more employees for each working day in each of 20 or more calendar weeks in
> the current or preceding calendar year, and any agent of such person . . . except
> that the term 'employer' does not include the United States, a corporation wholly
> owned by the government of the United States, an Indian tribe or a bona fide
> private membership club (other than a labor organization) that is exempt from
> taxation under section 501(c) of Title 26."

42 U.S.C. § 12111(5)(A) and (B).

The test for determining the existence of an employer/employee relationship is a question

for which the courts may look to statutory authority, but for which they may also turn to common

law.  For instance, in making this determination, "the Court looks at the 'economic realities of

the relationship.'" *Reich v. Parker Fire Protection District,* 992 F.2d 1023, 1027 (10th Cir.

1993).  The FLSA, defines "employer" to include "any person acting directly or indirectly in the

interest of an employer in relation to an employee. . ." 29 U.S.C. § 203(d).  There is no practical

reason for which a different test for the definition of "employer" would need to be applied for

purposes of the EEOC's claims in this case.  Ultimately, regardless of which federal agency is

seeking to enforce its statutory authority over an employer-employee relationship, the review of

the various elements of the relationship, and resulting determination of applicability of the labor

and employment laws of the United States, will typically turn on the same set of facts.  In

determining employer status, "economic reality" prevails over technical common law concepts

of agency. *Goldberg v. Whitaker*, 366 U.S. 28, 33 (1961).  The courts have historically examined

a totality of factors and circumstances revolving around control and compensation.  The

conclusion of whether an entity is an employer is sometimes aided by referring to the language

of the statute for whether the business is expressly excepted in a list of entities or organizations

that are <u>not</u> included as an employer under the statute, such as "the United States, a corporation

wholly owned by the government of the United States, or an Indian tribe; or a bona fide private

membership club" under the definitions of the ADA, 42 U.S.C. §12111(5).

Regardless of whether a statutory definition or an "economic realities" test is applied,

there are sufficient uncontroverted material facts presented here (including those admitted to by

Defendant in conjunction with the DOL's suit against the same party, HCF/HTS)  that aid in

establishing that Defendant is an "employer" and that the aggrieved individuals identified by the

DOL and the  EEOC's in their respective cases were, in fact, "employees."  The relevant facts

are as follows:

At all times relevant, hereto, HCF has been an enterprise engaged in commerce.

(EEOC UMF No. 14)  HCF is a for-profit corporation with its principal place of business

located in Goldthwaite, Texas, and conducted business within the State of Iowa. (EEOC

UMF NO. 15).   Beginning in the late 1970's, Henry and T.H. Johnson negotiated with

Louis Rich Foods to supply workers to work at the Louis Rich turkey processing plant in

West Liberty, Iowa.  (EEOC UMF NO. 16). Over the years, the plant changed ownership several times, but HCF/ HTS continued to provide workers throughout each change of ownership. (EEOC UMF NO. 17).  From at least 2006 to February 2009, HTS disabled *employees* worked on the turkey processing line, commingled with the plants' non-disabled *employees*. (emphasis added)(EEOC UMF No. 5).  During the entire period they worked at the turkey processing plants, the HTS disabled *employees* were housed in a converted school house, known as the Bunkhouse. (emphasis added) (EEOC UMF No. 6).  In 1996, HCF/HTS entered into a Contract with WLF, and per the Contract, HCF/HTS provided an adequate number of "Contractor's *employees*" to perform services. (emphasis added)(EEOC UMF No. 18).  As part of their day-to-day operations, HCF/HTS determined which of the workers would be assigned to the facility for work. (EEOC UMF No. 19).  HCF/HTS supervisory crew chiefs, not West Liberty Foods employees, directly supervised the HCF/HTS workers on the processing line. (EEOC UMF No. 20).  A few identified victims worked at the Bunkhouse rather the plant, and HCF/HTS was the company who determined which individuals worked at the plant versus the Bunkhouse. (EEOC UMF No. 21). HCF made the decisions regarding the rate of pay for the disabled workers and the manner in which those workers were paid. (EEOC UMF No. 22).  From 2006 to 2009, HCF/HTS disabled *employees* worked in the Evisceration Department of the turkey processing plant. (emphasis added)(EEOC UMF No. 23).  HCF/HTS *employees* were brought to the plant from the Bunkhouse in HCF/HTS vans driven by HCF crew chiefs. (emphasis added)(EEOC UMF No. 24).

HCF/HTS crew chiefs supervised the HTS workers who filled the positions on the processing line and determined which individuals worked at the plant versus the

14

Bunkhouse. (EEOC UMF No. 21).  HCF/HTS always made the decisions regarding rate of pay and the manner in which those workers were paid and when the workers would be "retired" and no longer work at the plant. (EEOC UMF No. 22).  HCF/HTS received over $500,000 annually in 2006, 2007, and 2008 from WLF in compensation for work performed by HCF/HTS *employees* on the line. (emphasis added)(EEOC UMF No. 25).

Other than control of business and personnel decisions, compensation issues, and supervision of day-to-day operations referenced through the above-cited evidence, HCF/HTS also treated the 32 disabled men as employees with regard to payroll processing, maintenance of pay records, and income and wage reporting.  During 2006 to 2009, the disabled workers were listed as *employees* of HCF on documents submitted to the Texas Workforce Commission's Unemployment Tax Services. Also during that time, HCF/HTS, as the stated *employer* of the disabled men, withheld Social Security and Medicare taxes from the income of each listed individual. (emphasis added) (EEOC UMF Nos. 26 and 27).  Also from 2006 to 2009, HCF/HTS, as the stated *employer* of the disabled workers, completed Form W-2 Wage and Tax Statements for each listed individual. (emphasis added)(EEOC UMF 27).   Admitting that the defendant company was paid for the work performed by its "employees", HCF/HTS acknowledges that WLF compensated HCF/HTS in full for all work performed by the HCF/HTS *employees* on its line. (EEOC UMF No. 28). Perhaps one of the most definitive confirmations that HCF/HTS had an employer-employee relationship with the disabled workers comes from the company President and co-owner, Kenneth Henry.  Mr. Henry, himself, admitted that HCF/HTS was the *employer* of all the disabled workers, regardless of whether they were

working at the West Liberty Foods processing plant or at the Bunkhouse. (emphasis

added)(EEOC UMF No. 29).

Mr. Kenneth Henry's role as Vice President and then chief executive officer after

T.H. Johnson passed away in 2007, as well as 50% co-owner[4] serves as compelling

evidence and establishes as a matter of law that HCF/HTS exercised the exclusive kind

of control that makes undeniable, the truth that HCF/HTS was the employer of the

disabled workers on whose behalf EEOC has filed these wage claims. No reasonable

finder of fact could reach a different conclusion but that an employer-employee

relationship existed for decades and continued to exist during all times relevant to this

case.  HCF/HTS supervisors and managers prepared and maintained all time, pay and

other employment records for those individuals. (EEOC UMF No. 33).   Kenneth Henry

and T.H. Johnson determined the rate of pay for the disabled workers.[5] When T.H.

Johnson became ill in 2005, Henry became more actively involved in the business in

Iowa, including handling the financial responsibilities of the operation. As early as 2005,

Henry was scheduling the work of supervisory personnel at the Bunkhouse in Atalissa,

Iowa.  Hiring of workers in Iowa was subject to Henry's approval. (EEOC UMF Nos.

30-31).  From 2006 until the Atalissa Bunkhouse was shut down on February 7, 2009,

Henry became increasingly responsible for the Iowa business, including becoming more

involved with the Supervisors Randy and Dru Neubauer.   In fact, Henry directed Randy

Neubauer to cut the hours supervisors were working at the Bunkhouse. (EEOC UMF No.

31).  In 2008, officers of the company, Jane Ann Johnson and Henry jointly made the

---

[4]  *Solis v. Hill Country Farms, Inc.,* 808 F.Supp.2d at 1108-1109, 1116.
[5]  *Solis v. Hill Country Farms, Inc.,* 808 F.Supp.2d at 1105, 1110.

decision to stop providing workers to the WLF processing plant and to shut down the facility in Atalissa, Iowa.  Only an employer could make such a decision.  Henry informed WLF of the decision to shut down and determined the order that the workers would be cease to work at the plant. (EEOC UMF No. 32).

It can be anticipated that Defendant will again attempt to argue that West Liberty Foods, not HCF/HTS  was the employer, a defense asserted unsuccessfully in the prior suit brought by the U.S. Department of Labor and in the administrative and judicial proceedings for the State of Iowa.  The implausible argument notwithstanding, even an unlikely conclusion that HCF/HTS was not the sole employer would not relieve the Defendant of its responsibility as an employer for purposes of liability under the ADA.  Whether West Liberty Foods would also qualify as an employer is not material to the ultimate issue of liability of HCF-HTS. Once HCF/HTS is determined to be an employer with a responsibility for compliance with federal labor and employment laws, it cannot avoid its own responsibility by engaging in the litigation version of the "blame game".  There is no dispute that West Liberty Foods paid the company, HCF/HTS, for the work performed in amounts totaling over $500,000 each year over three years time in 2006, 2007 and 2008. (EEOC UMF Nos. 25 and 28).  It was the self-described and admitted employer, HCF-HTS, that then failed to pay the wages from the total WLF income source to the disabled employees based on their hours they worked.  HCF/HTS, as the employer, is therefore liable for all unpaid minimum wages and overtime compensation due the disabled workers.

**D. Defendant is liable for wages due the identified workers in accordance with the applicable federal and Iowa state minimum wage rate for the entire two-year period from February 2007 to February 2009.**

Defendant's Iowa Supervisor, Randy Neubauer, filled out time records for all of the disabled employees, whether the disabled employees worked at the plant or at the Bunkhouse.

17

The records were then sent to the main office in Goldthwaite, Texas, where they were

transcribed onto HCF/HTS monthly timesheets. (EEOC UMF No. 33)  These records were

obtained by the Texas Attorney General, the U.S. Department of Labor Wage and Hour Division,

and the EEOC pursuant to their respective investigations in 2009.

The minimum wage rates for the State of Iowa for the periods covered by the EEOC's

suit, from February 2007 through February 2009, are specifically set by state statute, and are thus

not subject to dispute.  2011 Iowa Code, Title III Public Services and Regulation, Subtitle 2

Employer Services, Chapter 91D Minimum Wage; 91D.1 Minimum wage requirements —

exceptions – provides in pertinent part as follows:

Section 91D.1  MINIMUM WAGE REQUIREMENTS -- EXCEPTIONS.

1. a.  The state hourly wage shall be at least $6.20 as of
April 1, 2007, and $7.25 as of January 1, 2008.

For  Iowa's law setting minimum wages between n February 2007 and April 1, 2007, an earlier

(2005) version of the same Iowa Code Section and subsection provide guidance:

1.        a.  The hourly wage stated in the federal minimum wage law, pursuant to 29
U.S.C. § 206, shall be increased to $3.85 on January 1 of 1990, $4.25 on January 1 of
1991, and $4.65 on January 1 of 1992.
            b.  Every employer, as defined in the federal Fair Labor Standards Act, shall pay
to each of the employer's employees, as defined in the federal Fair Labor Standards Act,
wages of not less than the current federal minimum wage, pursuant to 29 U.S.C. § 206, or
the wage rate stated in paragraph "a", whichever is greater.

Therefore, according to the Iowa Code, for the period between February 2007 through the

end of  March 2007, the federal minimum hourly wage of $5.15 per the FLSA, as amended,[6]

would be applied as the appropriate wage rate for the HCF-HTS employees.

---

[6]29 USCA §206. Minimum wage...
(a) Employees engaged in commerce; home workers in Puerto Rico and Virgin Islands; employees in
American Samoa; seamen on American vessels; agricultural employees
Every employer shall pay to each of his........at the following rates:  (1) except as otherwise provided in
this section, not less than $4.25 an hour during the period ending on September 30, 1996, not less than

Based on these wage rates, the 32 employees represented by the EEOC, who had been residents working in the state of Iowa for at least 30 years, should have been paid at a wage rate in accordance with the minimum wage rates for the State of Iowa when greater than the federal minimum wage rates.  More specifically, the wage rates applicable for the Iowa workers which, which  HCF/HTS should have paid its employees was at least $5.15 per hour from February 24, 2007 through March 31, 2007, after which they should have been paid at a wage rate of at least $6.20 per hour between April 1, 2007 and December 31, 2007.  From January 1, 2008 through February 7, 2009, employees should have been paid an hourly wage rate of at least $7.25, as determined by Iowa law. (EEOC UMF Nos. 34-35)

The number of hours worked by the disabled workers for a period that encompasses the EEOC's time frame of February 2007 and February 2009 was precisely calculated by the U.S. Department of Labor, Wage and Hour Division Investigator, Kevin O'Brien.  This calculation (including both wages and overtime) based on hours worked by the disabled men, was attached to the Declaration of  Kevin O'Brien in the DOL's Motion for Partial Summary Judgment filed with the U.S. District Court for  the Southern District of Iowa, Davenport Division, *Solis v. Hill Country Farms, Inc.,* 808 F.Supp.2d 1105 (2011).  DOL/WHD Investigator  O'Brien's updated Declaration for EEOC, dated June 2012, containing the same calculation("EEOC O'Brien Declaration") is found at App. 530-546 accompanying this motion.

Each timesheet completed by HCF/HTS personnel was stamped with lines marked "Actual Income," "in kind Room & Board," "in kind Care" and "Total." HCF/HTS represents

---

$4.75 an hour during the year beginning on October 1, 1996, and not less than $5.15 an hour beginning September 1, 1997: (effective Aug. 20, 1996 through Aug. 24, 2007)(Current version at 29 U.S.C. §206(2012), FLSA. (emphasis added).

that the "Total" amount reflected the wages "paid" to the disabled employees each month, either in cash or the cost to HCF/HTS of furnishing the disabled employees with room, board and care. (EEOC UMF No. 36)

The "Actual Income" (cash wages) of $65.00 paid to the disabled employees never varied; it was the same month after month, year after year. (EEOC UMF No. 7).  Even when HCF/HTS's timesheets reflected that the employees worked over 40 hours in a week, the stated wage on the timesheet always remained the same; there was never an amount listed as overtime. (EEOC UMF No. 37). Only the $65.00 per month was reported to government agencies as wages paid. (EEOC UMF No. 38).  Based on the calculations performed by the U.S. Department of Labor, HCF/HTS failed to pay its disabled employees sufficient wages to meet the minimum wages and overtime amounts required by law. (EEOC UMF No. 39).

In order to calculate the wages owed to each disabled employee who worked on the processing line at West Liberty Foods, DOL/WH Investigator O'Brien used the WLF's weekly line operating times as the base amount of hours worked by each employee each week.  Further steps in the methodology of the Investigator are set forth in the EEOC O'Brien's Declaration, App. 530-546.

The DOL calculations of federal wages as applied to the records of hours worked provided the total amount of weekly wages due each employee. From those weekly amounts, HCF/HTS payments reflecting the undisputed $65 per month distribution was deducted. EEOC O'Brien Declaration, App. 530-546; also, DOL SOF, p. 12-14, Nos. 76-81, App. 67-69; HCF RSOF, p. 5, Nos. 76-81), App. 81.[7]

Based on DOL/WHD calculations for both plant and Bunkhouse disabled employees, none of which have ever been countered or refuted with any evidence to the contrary, HCF/HTS

---

[7] *Solis v. Hill Country Farms, Inc.,* 808 F.Supp.2d at 1112.

was determined by the government to owe the disabled employees unpaid minimum wages and

overtime compensation in the amount of $518,727.88 for the period from November 25, 2007 to

February 7, 2009. (EEOC UMF No. 40).[8]

The significant difference between the back wages totals now being proffered by the

EEOC and those that have already been accepted and awarded by the federal district court in the

parallel DOL suit is that, while the tabulation of "total hours worked" by each employee remains

the same, the calculations of weekly wage losses resulting from unlawful underpayment are

higher sums under the alternative models being constructed in EEOC models for lost wages.

These differences in calculated losses are demonstrated in the presentation of models as

alternatives to the lower federal minimum wage figures under the FLSA (the statute for which

DOL has governmental enforcement jurisdiction).  The EEOC's calculations of lost wages for

the 32 disabled workers are presented here in two models for the Court's consideration.

The EEOC first contends that, at the very least, the measure of unpaid wages owed to the

victims by HCF/HTS should be based on the rates set forth by the Iowa Code for the minimum

wage rates for February 2007 through February 2009. (EEOC UMF Nos. 34-35; Declaration of

EEOC Analyst Charles McGhee, w/ attachments "EEOC Pay Model A," at App. 583-718).  The

EEOC would further urge, however, that the most appropriate wage rates which should be

considered in identifying and awarding full monetary remedy to the underpaid workers is the rate

---

[8] Since the Wage and Hour Investigator also calculated an additional year of pay for the DOL suit, extending the
relevant time frame to November of 2006, the EEOC is able to rely on the estimated hours worked as calculated by
the DOL/WHD to include the EEOC's two-year timeframe of February 2007 through February 2009.

paid to non-disabled persons who worked in the same or similar job positions as the disabled workers.  The discussion of this second alternative model will be discussed below under *Section F* regarding make-whole relief for lost wages resulting from discrimination.

In compiling both of the alternative EEOC Models of compensation for the 32 disabled workers, the EEOC assembled and calculated the relevant wage and hour data as follows: First, EEOC consulted with DOL/WHD staff to discuss the manner of calculation that was used for the submission of wage totals, ultimately accepted by the U.S. District Court in the FLSA case, and upon which judgment was granted, *Solis v. Hill Country Farms, Inc.*, 808 F.Supp.2d 1105 (S.D. Iowa 2011), *aff'd*, No. 11-3069, 2012 WL 1674176 (8th Cir. 2012). (McGhee Declaration, App.583-587).  The DOL/WHD staff then provided the EEOC with the underlying data calculation spreadsheets to serve as a foundation on which the EEOC would then construct its own wage claim damages. The EEOC relied on DOL/WHD accounting of hours worked, and then multiplied the hours for each employee by the correlating wage rates.  For "EEOC Pay Model A," the Iowa state minimum wage rates applicable for each relevant period were inserted into the wage column for calculation.  (McGhee Declaration, App.583-587). For "EEOC Model B," discussed below in *Section F,* the EEOC inserted the geographic area market wage rate that was applicable based on the West Liberty Foods "Production" wage charts, which contain a cross indexing of the job categories with years of tenure.

The total of lost wages for the disabled HCF/HTS workers during the relevant two-year period was calculated by EEOC to be $762,760.30 (not including prejudgment interest) under Model A, utilizing the  Iowa hourly minimum wage figures. (EEOC UMF No. 43) (McGhee Declaration, Total Wage Page for "EEOC Pay Model A," App. 583-718)

For reasons stated above,[9] EEOC urges that issue preclusion should be applied here as a collateral estoppel with regard to HCF/HTS defenses to claims of wage violations which HCF/HTS has previously unsuccessfully asserted in *Solis v. Hill Country Farms, Inc.*, and as likewise having failed in both administrative proceedings and district court judicial review in the in the State of Iowa.[10]   Issue preclusion notwithstanding, HCF/HTS has argued three meritless defenses that fail under a summary judgment analysis.  In addition to the transparently meritless defense that HCF/HTS was not an "employer" of the disabled workers, Defendant has also invoked two different sections of the FLSA, 29 U.S.C.A. §214(c) and §203(3)(m) ("14(c)" and "3(m)") as defenses for the nonpayment of minimum wages in  amounts that were calculated by the DOL as due and owing to the disabled employees.  These defenses ultimately failed before the U.S. District Court for the Southern District of Iowa.  For reasons that are easy to understand, the same arguments likewise failed in the administrative and judicial processes of the State of Iowa.

HCF/HTS has argued that it was within its rights as an employer to pay sub-minimum wage amounts because it was operating as under a 14(c) certification exception in the FLSA that allows for "handicapped" or disabled workers to be paid based on a demonstrated lower level of productivity than that of non-disabled workers performing the same or similar work. Defendant's attempt to justify its unlawful denial of minimum wages, however, is a non-starter based on the DOL's evidence and position that HCF/HTS was not operating under a 14(c) and was not in compliance with the pertinent federal regulations[11] to qualify for such certification

---

[9] *Section A* of  II. Statement of Matter,  pages 7-11.
[10] *In the Matter of Henry and Johnson d/b/a Hill Country Farms and Henry's Turkey Service v. Iowa Department of Workforce Development, Division of Labor Services*, IWD No. CP-003-09/DIA No. 09IWD030,  (App. 36-55).  The Final Agency Decision was appealed by HCF/HTS, but was upheld on a Petition for Judicial Review rendered by the Iowa State District Court for the Fifth Judicial District in *Henry et al. v. Iowa Dep't of Workforce Dev.,* No. CV8615, (Dist.Ct. Sept. 9, 2011)(*unpublished*) ("*Henry v. IDWD*")
[11]  29 C.F.R. §525.9

several years prior to the relevant time period. (Declaration of DOL/WHD District Director

Michael Staebell, dated June 2012, ("EEOC Staebell Declaration"), App. 522-529;  Also, EEOC

UMF No. 44-45)

Further, the evidence is clear, according to the West Liberty Foods managers and the

HCF/HTS supervisors, that the disabled workers performed as productively and effectively as

non-disabled workers doing the same jobs at the turkey processing plant. (EEOC UMF No. 46)

The U.S. Department of Labor had investigated HCF/HTS for minimum wage and

overtime violations on more than one occasion in the years prior to the cessation of business in

February 2009. (EEOC Staebell Declaration, App.522-529; EEOC UMF Nos. 12-13, 45, 47) As

a result of those government investigations of HCF/HTS, including one that concluded in 2003,

HCF/HTS pay practices and defenses, which were the same as those in *Solis v. Hill Country

Farms,* and the subject of the instant litigation, were found to be unlawful.  HCF/HTS attempted

to legitimize its pay scheme by claiming to have used a reduced compensation methodology,

admitting that it did so because the employees were disabled or "handicapped."  (EEOC UMF

No. 44)  However, without the cover of Section 14(c), HCF/HTS's justification and defense

simply serves as direct and uncontroverted evidence that the reason for the pay scheme, the

disability or "handicap" of the employees, constitutes a violation of the Americans with

Disabilities Act of 1990 ("ADA"), as amended. 42 U.S.C. §12112(a).  This intent is established

by the defensive posture assumed by HCF/HTS without even going further into the ample

evidence of intentional and financial exploitation of the vulnerable HCF/HTS workforce.

Beyond the direct evidence or admitted motivation presented here, there is far more than

a preponderance of irrefutable evidence that the HCF/HTS officers and managers underpaid the

disabled workers while diverting profits and even SS and SSI funds to the employer's own

benefit.  The nature of the exploitation of persons with disabilities will be discussed in greater

detail below in *Section F*, regarding evidence of pay violations because of the intellectual

disabilities of the 32 victims identified by the EEOC.  (See Declaration with Report Excerpt of

EEOC Expert Witness, Dr. Sue Gant, ("Expert Gant Declaration")  App. 919-952)

> **E.  Defendant cannot avail itself of minimum wage credits pursuant to 29 U.S.C. §
> 203(m), ("Section 3(m)") of the  Fair Labor Standards Act ("FLSA") to
> supplement the actual wages of $65.00 per month paid to the disabled workers.**
>
> > **1.  The disabled workers, not HCF/HTS, paid expenses claimed as Section
> > 3(m) credits.  Employees' personal Social Security and SSI funds were
> > used for expenses claimed to have been incurred by HCF/HTS.**

The purpose of Section 3(m) is to allow an employer a credit against minimum wage and

overtime wages due for reasonable costs the employer incurred in furnishing the employees with

"board, lodging or other facilities."  29 U.S.C. § 203(m); 29 C.F.R. Part 531, Subpart B.  The

reality in this case is that the disabled employees, themselves, were the ones who paid for all or

most of the costs for which HCF/HTS now wants to be credited as having paid.  It is undisputed

that the disabled workers received Social Security ("SS") and/or Supplemental Security Income

("SSI") benefits. (EEOC UMF No. 9).  HCF/HTS, in the person of Jane Ann Johnson, was the

self-appointed Designated Representative Payee for each of the employees' SS and SSI benefits.

(EEOC UMF No. 10).  The benefits were directly deposited on a monthly basis into the

employees' individual bank accounts, which were located at the Mills County State Bank in

Goldthwaite, Texas, even after the 30 years that the disabled workers lived in Iowa. (EEOC

UMF No. 10).  Jane Ann Johnson had total and complete access to these accounts.  Checks,

made payable to the HCF/HTS business entity, were written each month from each employees'

to HCF/HTS for "Room and Board."  All the checks from the employees' accounts were written

and signed by Jane Ann Johnson, Treasurer/Vice-President and co-owner of HCF/HTS. (EEOC UMF No. 9-11, 48).

Checks were also written to HCF/HTS from each employee's SS and SSI account on a regular basis to reimburse HCF/HTS for miscellaneous items called "ledger" expenses -- items such as doctor's bills, clothes and entertainment expenses. Checks were also issued from these SS and SSI accounts to "Cash" on a monthly basis with notations of "spending money" and "entertainment," although the ultimate recipient of these monies is not confirmed. (EEOC UMF Nos. 9-11, 48).

HCF/HTS has unpersuasively argued that the amounts for such things as lodging, utilities, transportation, food, health care, clothing and entertainment should be credited to the minimum wage totals when evaluating compensation paid to the disabled workers.  The amounts that HCF/HTS (1) deducted from the men's wages which flowed from WLF earnings; and [12] (2) paid to itself out of the men's SS and SSI accounts, as reimbursements, are indicated on pay records which show the following:

2008:

a. Monthly payment from each man's Social Security benefits accounts to HCF/HTS in the amount of  $487.00 for "room and board" and "in kind care".
b. Monthly payroll deductions from the monies received from West Liberty Foods in the amount of $487.00 for "room and board".
c. Monthly payroll deductions from monies received from West Liberty Foods in the amount of $572.00 for "in kind care".

(EEOC UMF No. 49)

2007:

a. Monthly payment from each man's Social Security benefits accounts to HCF/HTS in the amount of $473.00 for "room and board" and "in kind care".

---

[12] (See Declaration of Allen Hansen, Controller of WLF, dated June 2012, ("EEOC Hansen Declaration"), App. 571-582  for amounts paid by WLF as wage source for work performed by the HCF/HTS employees; also EEOC UMF Nos. 25-26 )

      b.   Monthly payroll deductions from the monies received from West Liberty Foods in the amount of 426.28 for "room and board".

      c.   Monthly payroll deductions from monies received from West Liberty Foods in the amount of $549.81 for "in kind care".

(EEOC UMF No. 50)

These amounts of monies that HCF/HTS claims to have paid for the benefit of the employees, are documented on the lower right hand side of "Time Sheets for Henry's Turkey Service" recorded by Iowa and Texas HCF/HTS supervisory or office personnel who performed one computation for everyone.  The figures for all the disabled men were then calculated by HCF/HTS accountant and corporate officer, Robert Berry. (EEOC UMF Nos. 33 and 36).

The fallacies of Defendant's arguments for crediting the alleged expenses to supplement the total for wages paid are obvious.  In order for credits to be allowable under Section 3(m) of the FLSA, and in accordance with the definition of "reasonable costs" under 29 C.F.R. 531.3(d), the expenditures for such things as "room and board" must not be "primarily for the benefit or convenience of the employer".  The Bunkhouse, where the company restrictively required disabled workers to live while working, was rented by HCF/HTS from the city of Atalissa, Iowa, for a mere $600.00 per month total cost for housing all 32 disabled men.  The rent expense also covered the unspecified cost of providing room and office space for supervisors, Randy and Dru Neubauer, and for the company President, T.H. Johnson  (amounting to just a little under $20 per capita for all who lodged there). (EEOC UMF No. 53).

Meanwhile, for example, in 2008, the charge of $487.00  per month for "room and board and in kind care" for each disabled man was being drawn by HCF/HTS from the disabled man's personal SS and SSI funds account, with yet another $487.00 for "room and board" being purportedly deducted from their West Liberty Foods wage source.  Defendant's math is simply illogical.  Either the men's expenses were being "reimbursed" to the company from their own

Social Security benefits, and therefore, not actually paid by the employer for the benefit of the employee, or the men were paying double the amount, equaling $974.00 for "room and board" and "in kind care" in addition to another $574 deducted from their West Liberty Foods wages for "in kind care", mounting to a total of over $1,500.00 per month, not counting other medical and miscellaneous "ledger" amounts being taken from their Social Security funds every month. Whichever is the explanation Defendant would attempt to rely upon to try to explain its misdirection, irreconcilable misallocation or non-payment of monies that rightfully belonged to the disabled workers, such defense must be rejected. To date, no segregated or detailed accounting of how "expenses", "deductions", or "credits" were allocated has ever been presented in a manner that can satisfy the legal requirements for Section 3(m) credits. (EEOC UMF No. 47)

> **2. Section 3(m) credits claimed by HCF/HTS were unsupported based on applicable FLSA regulations which require that costs be incurred for the benefit of the employee, and documented with specific accounting.**

As a third line of defense, HCF/HTS has also argued that, under §203(3)(m), HCF/HTS should be credited with having paid more than the $65.00 actual wages per month in the form of expenses that were allegedly incurred for the benefit of the employees. (EEOC UMF No. 36) However, once again, the persons most directly involved in the DOL/WHD investigations of HCF/HTS, Director Michael Staebell and Investigator Kevin O'Brien, found that Section 3(m) credits were not supported or properly accounted for by the company, and thus, could not be credited toward payment of federal minimum wages, or toward any other wages for that matter. (EEOC UMF Nos. 45 and 47; EEOC Staebell Declaration, App. 522-529; EEOC O'Brien Declaration, App. 530-546)

HCF/HTS has argued that it should be credited with the amounts of money it paid for things that supposedly benefitted the men for whom the company also had taken on a dual responsibility as "caretakers". HCF/HTS's own timesheets and pay records, however, establish that the Defendant did not pay its employees cash wages sufficient to meet the minimum wage and overtime compensation required by the FLSA. The burden thus shifts to HCF to prove with proper records the reasonable cost, if any, HCF/HTS incurred as the employer in providing "in kind" Room and Board and Care. *Donovan v. Williams Chemical Co., Inc.,* 682 F.2d 185, 189-90 (8th Cir. 1982); *Caro-Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1514 (11th Cir. 1993). Defendant HCF/HTS cannot meet the burden of proof to show reasonable costs expended and eligible for crediting.

29 U.S.C. §203(m) of the FLSA provides, in relevant part:

> "Wage" paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees…

The "reasonable cost" can "be not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees." 29 C.F.R. § 531.3(a). "'Reasonable cost' does not include a profit to the employer or to any affiliated person." *Id*. at §531.3(b). The employer is required to keep records substantiating the cost incurred in furnishing board, lodging or other facilities. *Id*. at § 516.27(a). Any deductions from or additions to the base wage for room and board or other facilities must be recorded on a workweek basis. Id. at § 516.27(b). Applicable regulations defining "reasonable cost" state that "facilities found by the Administrator to be primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages." 29 C.F.R. 531.3(d).

In determining whether a facility is "primarily" for the benefit of the employer or the employee, courts have focused on whether a particular facility has substantial value to and could be freely used by the employee independent of the job performed. *See, e.g., Soler v. G & U Inc.,* 833 F.2d 1104(2d Cir. 1987), *cert. denied,* 488 U.S. 832 (1988).

"Deductions...for housing furnished to the employees are not allowed when the employer *requires* an employee to live on the premises to be "on call" to meet the needs of the employer. In such a case the house is considered to be furnished primarily for the benefit of the employer and the employer is not entitled to have the cost included in computing wages under Section 3(m)..." *See* 1996 WL 1005231, U.S. Dept. of Labor, Op. Ltr. of the Wage-Hour Adm. (Nov. 5, 1996).   While some courts have held there to be a presumption that lodging is a reasonable cost deductible from wages, where an employer requires an employee to live on-site to meet a particular need of the employer, or when an employee is required to be on call at the employer's behest, the presumption may be rebutted. *Soler, supra,* at 1109-1110; and *Marshall v. Truman Arnold Distribution Co., Inc.,* 640 F.2d 906 (8th Cir. 1981).  Where rooms were found to be primarily furnished for the benefit of the defendant employer, since the employees were required to live at the premises and since at least one employee had to be available at all times, the employer was not entitled to have the cost of furnishing lodging included in computing wages under 29 U.S.C. § 203(m). *Marshall v. Bernard Debord* (E.D. Okla. 1978), 1978 WL 1705*5, *citing Masters v. Maryland Management Co.*, 493 F.2d 1329, 1334 (4th Cir. 1974) and *Bailey v. Pilots' Association,* 406 F.Supp. 1302, 1309 (E.D.Pa. 1976).

Further, courts have <u>not</u> permitted Section 3(m) credit for lodging when the housing is substandard or not "customarily furnished" to other employees.  See *Castillo v. Case Farms of*

*Ohio, Inc.,* 94 F. Supp. 2d 578 (W.D. Tex. 1999) and *Osias v. Marc,* 700 F. Supp. 842, 845 (D.

Md. 1988).  See also, *Donovan v. Williams Chemical Co., Inc.,* 682 F.2d 185 (8th Cir. 1982).

        Beyond the evidence about the use of the employees' Social Security monies which

mitigates against the finding that HCF/HTS actually paid the purported expenses, the

DOL/WHD investigation found that 3(m) credits sought for expenses related to the housing in

the bunkhouse were disallowed because the facility where the men were made to live by their

employer was determined to be unsafe for occupancy in February 2009 by the Fire Marshal for

the State of Iowa's Department of Public Safety.  The Bunkhouse also failed inspection by the

Iowa Department of Inspection and Appeals ("DIA").  That is when the all the employees were

removed from the building.  (EEOC UMF Nos. 51-52).  The Report of the Iowa Fire Marshal

(App. 914-918) and testimony of the DIA Inspector and Fire Marshal regarding unsafe, unclean

and unhealthy conditions can be found at 854-873 and 874-913, respectively.  The employees

were immediately evacuated due to the substandard construction-related hazards and overall

living conditions.  As referenced in the DOL's findings, Regulation 29 C.F.R. §531.31 provides

that facilities furnished in violation of Federal, State or local law ordinance or prohibition will

not be considered facilities customarily furnished for purposes of Section 3(m). The DOL/WHD

investigation also determined that the employer was unable to segregate utilities and insurance

costs between the bunkhouse and the attached trailers where non-disabled employees were also

housed.  (EEOC UMF No. 54; EEOC O'Brien Declaration, App. 530-546).

        With regard to claimed transportation expenses, the DOL/WHD investigation found that

no credit would be allowed for company vans, their insurance, fuel and maintenance because the

transportation of the disabled workers from home to work and for delivery of food to the workers

at the plant was for the benefit of the employer, not the employees.  Because other non-work

related transportation was not separately accounted for by the employer, HCF/HTS could not meet its burden for identifying and segregating such costs as required by the FLSA, 29 C.F.R. § 516.27.  Therefore, no transportation costs are credited to HCF/HTS for determining minimum wage values. (EEOC UMF No. 55; EEOC O'Brien Declaration, App. 530-546).

With regard to other miscellaneous expenses the employer claimed to have incurred for the benefit of the employees for such things as clothing, food, medical and entertainment, the DOL/WHD investigation found that such expenses had already been accounted for by the Social Security and SSI payments for what was identified by HCF/HTS as "room and board" and "in kind care" as well as other cash and ledger expenses.  These payments were being made by HCF/HTS, as a Representative Payee for each of the disabled workers, and thus were paid from the Social Security funds accounts of each of those individual employees to the company. Investigator O'Brien calculated figures from SS and SSI accounts based on "ledger" expenses of $211,542 in 2007; $214,816 in 2008; and $36,910 for the first few weeks of 2009.  DOL/WHD found these sums to be sufficient to cover the employer's claimed expenditures reflected in the check register kept by the company in the following amounts:  $155,287 in 2007; $148,646 in 2008; and $9,585 through February 7, 2009. (EEOC UMF No. 45 and 47; EEOC O'Brien Declaration, App. 530-546).  The DOL/WHD investigation concluded that, given the use of each employee's Social Security funds to cover the same kinds of expenses for which the employer seeks to claim credit, there would be no legitimate basis for treating these expenses as payroll deductions for purposes of 29 U.S.C. §203(m).  DOL/WHD concluded that HCF/HTS cannot receive 3(m) credit for costs which were reimbursed to the company from the employees' own SS and SSI benefits.

32

Therefore, back wages were computed by DOL/WHD on the premise that the disabled employees were due the full minimum wage, less wages of the $15 per week for 52 weeks ($65.00 per month/$780.00 per year) actually paid to the workers, and as reported by HCF/HTS to the federal government. (EEOC UMF Nos. 27 and 38).  The EEOC takes the same course as DOL toward calculation of  no more than $65.00 per month in assessing wages owed by HCF/HTS based on the same facts and legal principles.

Finally, HCF/HTS cannot prevail on a credits argument because the employer did not keep pay and expense records as required by FLSA regulations.  An employer has an obligation to keep records regarding its "reasonable cost" of providing "board, lodging or other facilities" in order to be credited for those costs pursuant to 29 U.S.C. § 203(m).  Its failure to do so does not shift the burden of proof to the government as a plaintiff.  *Donovan v. Williams Chemical Co, Inc.*, 682 F.2d 185, 190 (8th Cir. 1982).

29 C.F.R. § 516.27(b) provides that:

If additions to or deductions from wages paid
(1) so affect the total cash wages due in any workweek (even though the employee actually is paid on other than a workweek basis) as to result in the employee receiving less in cash than the applicable minimum hourly wage, or
(2) if the employee works in excess of the applicable maximum hours standard and (i) any additions to the wages paid are a part of wages, or (ii) any deductions made are claimed as allowable deductions under sec. 3(m) of the Act, the employer shall maintain records showing on a workweek basis those additions to or deductions from wages. (emphasis added.)

HCF/HTS's accountant, Robert Berry, calculated HCF/HTS's claimed "costs" of "in kind Room and Board" and "in kind Care."  He would begin with a $65.00 figure for every man regardless of job position or hours worked.  The same figure was used as the "Room and Board" charges to each disabled employee every month for an entire year.  Although the employees' $65.00 monthly salary remained the same year after year, HCF/HTS's "charges" for room and

board and care increased each year.  HCF/HTS made no sincere effort to maintain records on the required weekly basis. (EEOC UMF Nos. 36, 49-50; EEOC O'Brien Declaration, App. 530-546).

In light of the remedial nature of the FLSA, exceptions to the Act's minimum wage and overtime compensation requirements should be narrowly construed. *Johnson v. City of Columbia, S.C.,* 949 F.2d 127, 129 (4th Cir. 1991); *Donovan v. Brown Equipment and Service Tools, Inc.*, 666 F. 2d 148, 153 (5th Cir. 1982); *Hodgson v. Jones,* 453 F.2d 515, 519 (8th Cir. 1971).

Despite ample opportunity during extensive litigation surrounding HCF/HTS pay practices in both federal and state courts, HCF/HTS has never met its burden of proving it is entitled to Section 3(m) credits to offset the minimum wages and overtime compensation. Defendant is, therefore, liable to the 32 disabled employees identified for unpaid minimum wages and overtime compensation in the total mounts calculated by EEOC.  (See "EEOC Pay Model A", App. 588-718 attached to the McGhee Declaration, App. 583-587)

**F.  Defendant's reason for paying some of their workers less than federal or state minimum wage rates was because of the intellectual disabilities of the employees as established by Defendant's admissions and evidence of financial exploitation.**

Under the Americans with Disabilities Act of 1990 ("ADA"), as amended, an employer is prohibited from discriminating against a disabled employee because of  the disability with respect to "job application procedures, the hiring, advancement, or discharge of employees, *employee compensation*, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. Sec. 12112(a). (Emphasis added).

While there has never been a dispute in this case about whether the men, whose interests are represented by the EEOC, are persons with disabilities, it is nonetheless important to look to the courts that have recognized the importance of the guiding principles of the ADA as they

relate to the protections for persons with mental, intellectual, developmental or learning disabilities.  For instance, the Eighth Circuit Court of Appeals has observed that, "[t]he purpose of the ADA is broad and remedial: it is designed to provide 'a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Webb v. Garelick Mfg Co.*, 94 F.3d 484 (8th Cir. 1996) (quoting 42 U.S.C. Sec. 12101(b)(1)).  Under the ADA, "disability" is broadly defined to include "a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual." 42 U.S.C. Sec. 12102(A); *Taylor v. Nimock's Oil Co.*, 214 F.3d 957 (8th Cir. 2000). In determining what constitutes a "mental impairment" under the ADA, the federal district court for the Northern District of Iowa has looked to the EEOC regulations implementing the ADA:

> Mental impairment is further defined by EEOC regulations as 'any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness and specific learning disabilities.' 29 C.F.R. Sec. 1630.2(h).

*Walsted v. Woodbury County, Iowa*, 113 F. Supp. 2d 1318 (N.D. Iowa 2000).

"Limited intelligence" was construed to be a "mental impairment" by the court with respect to the allegation that the plaintiff suffered from an ADA-covered learning disability as she was substantially limited in the major life activities of "reading" and "learning." *Id.* at 1328-1329. *See also Rensink v. Wells Dairy, Inc.*, 741 F. Supp. 2d 1038 (N.D. Iowa 2010) (undisputed that plaintiff was a "disabled" individual under the ADA because of his IQ of 66, which resulted in a finding that he suffers from an "intellectual disability.  With respect to the concept or definition of "major life activities," prior to the ADA Amendments Act,[13]  which has provided for broadened definitional coverage, the Eighth Circuit has looked to guidance provided by the EEOC in its ADA regulations. The Circuit Court noted:

---

[13]  Pub. L. No. 110-325, 122 Stat. 3553 (2008)

> As defined in 29 C.F.R. Sec. 1630.2(1), the phrase "major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. Sec. 1630.2(i).

*Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1319 (8th Cir. 1996); *see also Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027) (8th Cir. 1999) (noting that learning was a major life activity within the meaning of the ADA).

The case that is now before this Court presents a story of the loss of human dignity that may well have been borne of better intentions in the 1960's, but which has devolved over the years into a morass of unfathomable and discriminatory, and exploitative conduct for which many disabled workers, 32 of whom are before the court, paid a price that was not only financial, but personal.  The workplace for the nation's disabled is place of burgeoning opportunities because of continued progress and greater understanding of  social, scientific, and economic factors that can impact the lives of  persons with varying levels of impairments.  Unfortunately, this case presents the darker side of what can happen to those persons who are segregated or isolated in time or space, as a result of employers who may sacrifice principle for profit in the workplace, leading to violations of the anti-discrimination laws of the United States.

In establishing that the company's employment practices were not only unlawful, but also discriminatory in violation of the ADA, the Court need go no further than the admissions, explanations, arguments and defenses of HCF/HTS which are premised on the fact that the Defendant has attempted to seek shelter from liability for its pay practices behind the provisions of 29 U.S.C. §214(c) of the FLSA.  While this defense wholly unsuccessful before the U.S. Department of Labor Wage and Hour Division, which has the authority for approving such exceptional certification requirements for wages paid to "handicapped" workers, the Defendant has not abandoned its arguments justifying paying its disabled workers a reduced wage. It is,

36

however, significant that although both federal and state courts have rendered decisions rejecting HCF/HTS defenses, the defense is nonetheless powerful evidence that the employer's acts with regard to compensation were "because of" the intellectual disabilities of the 32 men. This admission and excuse, although invalidated, constitutes direct evidence of a discriminatory motive in violation of the ADA.[14]

Beyond the evidence of motive based on the positions asserted by HCF/HTS to justify its conduct, there is ample evidence to support this Court's finding on summary judgment that the unlawful pay practices, including but not limited to underpayment, co-mingling of SS and SSI funds, and non-disclosure to the employee/payees of any accounting of payroll deductions, were perpetrated because of the employees' trust, susceptibilities and vulnerabilities as persons with intellectual disabilities. One of the nation's leading experts on care and support services available to individuals with intellectual and developmental disabilities, EEOC expert witness, Dr. Sue Gant, has a lifetime of background working with governments, institutions and the courts on the integration, educational and employment support for the disabled. (Statement of Qualifications and Curriculum Vitae of Sue Gant, PhD., attached to Expert Witness Declaration, App. 919-952).

In review of the instant case, Dr. Gant has rendered expert opinions and conclusions based on her review of the history and overall facts to date, surrounding the claims and defenses in EEOC's case against HCF/HTS. Her opinions and conclusions are based on  knowledge and information that includes by way of example, extensive interaction with the specific victims, state case workers, and service providers, and relies upon the review of reports generated by state officials, as well as deposition and hearings testimony of  HCF/HTS officers. After a number of

---

[14] 42 U.S.C. §12112(a).

findings and opinions contained in the excerpt of her Report, Dr. Gant has concluded, in part, that:

> "For all of the above reasons, I find that the employer-employee relationship between HCF/HTS and the 32 disabled workers represented by the U.S. Equal Employment Opportunity was one in which the employees were exploited with regard to their employment and wage compensation.  The employer engaged in pay practices, which had long proven to benefit the employer to the detriment of the interests of the disabled employees who were kept unaware of the nature and extent of the irregularities with respect to their wages, income and funds.  Those employees of HCF/HTS who were not disabled were not subjected to the same economic disadvantages by the employer that the 32 disabled men suffered at the hands of HCF/HTS while they were with the company."

Declaration of Expert Witness, Sue Gant, PhD., App. 919-952.  A full reading of the "Financial Exploitation" section of the expert's report and testimony provides further insights into purposeful acts by the employer to discriminate against its disabled employees.

These grave assessments and conclusions regarding the nature of the treatment of the disabled workers with respect to pay, and financial exploitation establish by a preponderance of the evidence, the discriminatory intent of the employer. Given this expert testimony, together with the 14(c) argument by HCF/HTS, there is no genuine issue of material fact upon which the employer can rely to sufficiently dispute or effectively rebut the proof of discrimination and avoid a finding of violation of the ADA, as a matter of law.

> **1.  The proper measure of make-whole damages for lost wages to be paid by the Defendant to the  identified disabled workers if disability discrimination is proved on summary judgment or at trial, is an equivalent wage rate as that paid to non-disabled workers at the West Liberty Foods plant with similar job positions/categories and tenure.**

Once a claim of employment discrimination is established, the victims of the statutory violation are entitled to recover any lost wages or other economic damages that would make them whole by putting them in the position they would have been had they not been discriminated against. *Dyer v. Hinky Dinky, Inc.*, 710 F.2d 1348 (8th Cir. 1983) (*Albermarle*

makes plain that Title VII's, back pay provision is inextricably linked to one of the central purposes of the law, which is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Citing Albermarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)). *See also, Smith v. World Ins. Co*., 38 F.3d 1456 (8th Cir. 1994) ("Once unlawful discrimination has been found, backpay usually should be awarded in furtherance of the [law's] goal to 'make whole' persons who suffer loss due to discrimination") quoting *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir. 1983), *citing Albermarle, supra,* at 421.  These principles of relief and remedy are parallel and analogous under the ADA.  *Albermarle* specifically held that, "...given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id*.

The remedy of back wages for the disabled workers, if discrimination is established, should not be limited to simply a federal or state minimum wage if there is evidence that similarly-situated workers who were not-discriminated against were earning wages that were determined by the market rather than the statutory minimum.  For example, in identifying a comparative occupational wage rate, the Court can look to the equivalent market wage rate of similarly-situated workers in the nearest relevant geographical area.[15]

In this particular case, however, a comparative occupational wage rate in the most relevant geographical market can be easily determined.  The search for the nearest comparative wage as a reference point would actually not have to be conducted beyond the very same turkey

---

[15] See as example source: Occupational wage source United States Department of Labor, Bureau of Labor Statistics, *Occupational Employment and Wages, May 2011*;  Meat, Poultry and Fish Cutters and Trimmers: $12.23 as the hourly mean wage for Iowa. This public information can be found at http://www.bls.gov/oes/current/oes513022.htm.

processing plant where the HCF/HTS workers were assigned to work for over 30 years, West Liberty Foods.  The wage rates paid to West Liberty Foods employees who worked in the same or similar positions and job categories as the non-disabled workers are set forth in a WLF wage tables or "Production" tables, which contain job categories and corresponding pay rates. (EEOC UMF No. 41; Declaration of Tara Lindsay, WLF Vice President of Human Resources, dated June 2012, with attachments ("EEOC Lindsay Declaration"), App. 559-566).

The EEOC's calculation of lost wages based on West Liberty Foods job categories and pay rates is submitted as "EEOC Pay Model B," App. 719-849, which is attached to  McGhee Declaration, App. 583-587.  It is undisputed that the disabled workers on the evisceration line all worked beyond the 20-25 year tenure indicated as the maximum of credited service time on the WLF wage charts.  Because the HCF/HTS workers served in various positions as attested to by Dave Meincke, Evisceration Line Supervisor at WLF, and Tara Lindsay, WLF Vice President of Human Resources, EEOC determined the wage rate applicable for calculation by referencing the job categories and positions that the HCF/HTS employees regularly filled according to the contractual arrangement with WLF.  The process for calculating wages based on a weighted average for the number of applicable WLF job categories, years of tenure and corresponding wage rates is explained by Chuck McGhee, Analyst with the EEOC who calculated the "EEOC Pay Model B" damages for back wages using the data and formulas provided by DOL/WHD. (EEOC UMF Nos. 42 and 43; McGhee Declaration, App. 583-587; EEOC Lindsay Declaration, App. 559-566; Meincke Declaration, App. 567-570).

The total of lost wages for the disabled HCF/HTS workers during the two-year period was calculated by EEOC to be $1,374,266.53 (not including prejudgment interest) under "EEOC Pay Model  B", utilizing the comparative or market wage rates paid to similarly-situated or

comparably qualified workers with equivalent tenure at West Liberty Foods.  (EEOC UMF No. 43).

## IV. Conclusion

Upon the above undisputed material facts, legal authorities and arguments, the EEOC requests that this Court grant such findings of fact and conclusions of law as would provide a just disposition of the subject claims in favor of the plaintiff EEOC.  The affirmative disposition of the wage claims and defenses as a matter of law would allow the parties to proceed to trial on only those matters which remain in dispute for final determination before a jury.  The EEOC's Motion for Partial Summary Judgment, and the evidence appended hereto, establish that Defendant, Hill Country Farms, Inc. d/b/a Henry's Turkey Service, engaged in unlawful and discriminatory practices against James Keith Brown and 31 other similarly-situated intellectually disabled employees referenced in the Complaint and more specifically identified in the EEOC's Amended Statement of Interest filed with the Court.

The EEOC respectfully requests that the Court grant its Motion for Partial Summary Judgment and with an issuance of findings of fact and conclusions of law as follows:

That irrespective of whether the doctrines of issue preclusion and collateral estoppel are applied, the EEOC has established by the weight of the evidence that Defendant's pay and compensation practices with respect to its disabled workers, violated the Americans with Disabilities Act;

That the EEOC, on behalf of all those persons represented in this action should be awarded monetary relief against Defendant based in an amount of wages representing a comparable market wage rate, equivalent to that earned by non-disabled employees performing the same or similar jobs, with comparable tenure at the West Liberty Foods, Inc. processing

facility where they worked;

That, at a minimum, if the Court determines that a market wage is not a fitting measure of relief, the remedy of damages for the wage violations should reflect an amount based on the minimum wage rates for the State of Iowa;

That, in the alternative, by application of the doctrines of issue preclusion and collateral estoppel, defenses to wage violation claims will not be relitigated and that such wage violations are, therefore, established as a matter of law for purposes of further proceedings on the issues of discriminatory intent and appropriate amount of lost wages as a remedy; and finally,

That if the Court issues a finding of discrimination and a specific award of lost wages, that the EEOC be afforded 30 days from the date of the Court's Order granting summary judgment, to present a calculation of prejudgment interest on the amount of damages awarded.


Respectfully submitted,

/s/ Robert A. Canino
ROBERT A. CANINO
Regional Attorney
Oklahoma State Bar No. 011782

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Dallas District Office
207 South Houston Street, 3rd Floor
Dallas, Texas  75202
TEL  (214) 253-2750
FAX (214) 253-2749

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on June 25, 2012, I electronically transmitted the attached

document to the Clerk of the Court using the ECF system of filing, which will transmit a

Notice of the Electronic Filing to Defendant's counsel, who is an EFC registrant.


David Scieszinski
Attorney for Hill Country Farms, Inc.
d/b/a Henry's Turkey Service
dvdls@netwtc.net

                                        /s/ Robert A. Canino
                                        Robert A. Canino