173

1    that long.  It just gives you longer burn-through

2    time.  It's a way to measure how long it's going to

3    take to burn through this wall, and I don't know how

4    accurate--  Well, I don't want to get into that, but

5    a minimum of an hour, but probably you're going to

6    have a two-hour rating between this garage and this

7    residential occupancy.

8        Q.    We're not entirely going through this, but

9    can you just flip forward to Exhibit 84?  Don't tell

10   me what is in between, but do you see 84?  Is that

11   the other side of this hallway?

12       A.    That actually would be down a little further

13   to--

14       Q.    Okay.  Fine.  Let's just go back.

15       A.    That's basically the same concept, though.

16   But, well, not really.

17       Q.    All right.  Let's go back to 82.

18       A.    Okay.  This is actually--82 goes into 84.

19       Q.    Okay.

20       A.    No. 82 is a residential room that goes

21   directly into the north garage.

22       Q.    Okay.

23       A.    And as you can see, on that--on the picture

24   No. 82, you see a door.  You do not see any type of

25   handle.  It means that door, if I go push on that

174

1    door, I could just push it open.

2         Q.    Okay.

3         A.    And you don't--you don't want to be able

4    to--from a resident's room, you don't want to use

5    this as egress into--you don't exit through a

6    hazardous space.  I deem a garage a hazardous space.

7    That is not an approved exit.

8         Q.    Okay.

9         A.    There is--like as you look at it, there is a

10   door on this side of the bed, say, but there--where

11   there's a corridor also, but that corridor also goes

12   around--goes either down--when you exit this room,

13   you can go the direction through this corridor here

14   in picture No. 81, or you can go around the back side

15   through another door that exits back into this

16   garage.  It's hazardous space.

17        Q.    Okay.  83.

18        A.    83 is your--that is the garage you have, and

19   84, is that garage there.

20        Q.    Let's--

21        A.    I'm skipping ahead.  I'm sorry.

22        Q.    83 is--we're looking at the exit there or--

23        A.    Exit, yes.  It's approximately 18 inches

24   wide.

25        Q.    How wide should exits be?

175

1      A.    That's a difficult question to ask, just

2   because--just because it depends on your occupancy,

3   as far as how many residents you have.

4      Q.    Is 18 inches ever allowed?

5      A.    No.

6      Q.    Why is there an arrow kind of pointing

7   towards the back of the van?

8      A.    I'm assuming that arrow is indicating your

9   exit into a space where you have a vehicle, or you

10  have, you know, through a hazardous area where you

11  have all that, and this would be considered one of

12  the hazards of this hazardous area where you would

13  not exit through.   The same garage also houses LP

14  canisters.   There's just numerous different

15  combustible items and ignitables in this.

16     Q.    And you saw these combustibles?

17     A.    Yeah.   I have pictures of where there's this

18  van, there's a motor home, there's LP bottles, and

19  then there's different equipment.

20     Q.    Okay.   So coming back to 84, you looked at

21  this.   This is not the same room, but you said this

22  is kind of a similar arrangement.   Can you tell us

23  why we care about this picture?

24     A.    Because, well, picture No. 81, go back to

25  picture 81, would exit--is one of these doors that

176

1  would exit directly into these doors.  That wall

2  should be two-hour rated, say, going back to that

3  rating.

4      Q.   Okay.

5      A.   So--and then also you have your air

6  conditioners, so what you're doing with having an air

7  conditioner, an air conditioner works, draws outside

8  air to cool the room interior.  Well, you don't

9  want--if you have a fire in that garage, you're

10  basically sucking that into that room.  Also, you

11  think about, too, is you have the possibility of CO,

12  carbon monoxide.

13      Q.   And where would that come from?

14      A.   From the vehicles that you would have--start

15  a vehicle in that garage.

16      Q.   And is it a concern that it would come

17  through the air conditioner?

18      A.   Yes.

19      Q.   Okay.  Exhibit 85?

20      A.   Okay.

21      Q.   Where are we here on 85?

22      A.   This is a boiler room.  This is on the first

23  floor.  These boilers, I think from talking to the

24  person that was in charge of the building said--I

25  think the last time these were in operation was in

177

1   2002.

2       Q.    And is that a concern?

3       A.    Well, what concerns me is how we're going to

4   be heating this if this is not going to be our way of

5   heating this property.

6       Q.    And how was the property heated?

7       A.    Well, through those--the heater like I

8   showed you in that recreational room, the space-type

9   style of heaters, and you can see that fan there.

10      Q.    The fan above?

11      A.    There is a fan on--basically sitting on one

12  of the boilers.

13      Q.    Okay.

14      A.    I can't--if it is standing or suspended

15  somehow, but there is another one of those heaters at

16  the end of this room, and that's drawing the heat

17  out.  It's blowing that heat out.

18      Q.    Okay.  86.

19      A.    That's one of our space heaters that we're

20  using.

21      Q.    Were there--how many of these were there; do

22  you recall?

23      A.    There's quite a few throughout the

24  facilities.  There's quite a few in the rest rooms

25  and just pretty much throughout the facility.

1    Q.    Does it concern you that space heaters are

2    being used, as an inspector?

3    A.    Yes, because you have the potential there

4    for a fire hazard.  How hot do they get?  Does it

5    have an anti-tip device?  If it gets knocked over, an

6    anti-tip saying it will shut off if it gets tipped

7    over, or does the heat element continue to heat?  If

8    it gets tipped over, will that carpet continue to

9    heat and set the carpet on fire.

10    Q.    Exhibit 87?

11    A.    Uh-huh.

12    Q.    A picture of a fire extinguisher?

13    A.    Just took a picture of the fire

14    extinguisher, just took a picture of the date--I kind

15    of overexposed the picture a little bit.  I think at

16    that time, was it 2008, those were within the--that

17    had been inspected, but the only thing that I noticed

18    that they weren't--didn't have a monthly visual

19    inspection was the only thing that I seen on the fire

20    extinguishers, so they have to be tested by--they

21    need to be tested or inspected by the people on site.

22    Q.    How often?

23    A.    Every 30 days.

24    Q.    And when was the last time you could tell

25    that it has been tested?

179

1    A.    I don't think they had the visual

2  inspection.  I don't think it had been marked,

3  initialed or dated on the back at all of that tag.

4    Q.    Let's go to 88.

5    A.    Okay.  You see a notification device that

6  had been painted.  Any time you have any type of fire

7  alarm, notification device, or any type of detection,

8  any time you have any type of paint or--so even like

9  with this, or a heat detector, or anything that has

10 any corrosion, or paint, or anything that gets on,

11 they have to be replaced.

12   Q.    Okay.  And why is that?

13   A.    Based on the (inaudible) because they might

14 not have effectively--worked effectively.

15   Q.    Okay.  Are we seeing anything in 89?

16   A.    Well, it says pull and break glass.  I

17 didn't see any glass.  It looked like it had

18 been--this pull station had been painted over.

19   Q.    Okay.  Is that a concern?

20   A.    I didn't test it to see if it worked

21 properly, but it just doesn't--it didn't appear--

22   Q.    (Inaudible.)  Does it raise a flag for you

23 that it's been painted over?

24   A.    Yeah.

25   Q.    Why?

1      A.    Because you're not supposed to be painting

2   or doing anything to fire safety devices.

3      Q.    And why would that be?

4      A.    Well, it could just deem them not

5   operational.

6      Q.    Okay.  So did you reach any conclusions

7   based on your inspection of the bunkhouse?

8      A.    As far as what do you--

9      Q.    After you--  Let's go chronologically.  So

10  you walked through the bunkhouse.

11          THE ADMINISTRATIVE LAW JUDGE:  Before you do

12  that, we should probably take a break pretty soon.

13  Why don't you tell me, is this a good time to do

14  that?

15          MR. MAHAN:  That's fine.

16          THE ADMINISTRATIVE LAW JUDGE:  If you just

17  have a few more questions, then I can wait.

18          MR. MAHAN:  I could be finished up.  Do we

19  have cross?

20          THE ADMINISTRATIVE LAW JUDGE:  Let's take a

21  break.

22          MR. MAHAN:  Okay.

23          (Short recess.)

24          THE ADMINISTRATIVE LAW JUDGE:  We're back

25  from our afternoon break.  We'll continue on with the

181

1   direct testimony of Mr. Wade.  You may proceed.

2   BY MR. MAHAN:

3       Q.   So, Mr. Wade, you walked through the

4   bunkhouse, and you took your pictures?

5       A.   Yes, sir.

6       Q.   What happened then?

7       A.   Well, there were representatives there from

8   DHS, and I informed them that we would probably be

9   closing the bunkhouse down immediately based on our

10  state fire marshal's office findings, and that nobody

11  would be able to come and live in this house,

12  residence, until it was deemed safe by the state fire

13  marshal's office.

14      Q.   Did you produce a report as a result of your

15  inspection?

16      A.   Yes, I did.

17      Q.   Take a look at Exhibit 90.

18      A.   Okay.

19      Q.   Do you recognize Exhibit 90?

20      A.   Yes.

21      Q.   What is Exhibit 90?

22      A.   Those are my findings from my report, or

23  from my inspection of the facility on the set-up of

24  '09.

25           MR. MAHAN:  Your Honor, Exhibit 90 is

182

1  offered into evidence.

2          MR. SCIESZINSKI:  No objection.

3          THE ADMINISTRATIVE LAW JUDGE:  Exhibit 90 is

4  admitted.

5                    (Respondent's Exhibit No. 90 was

6                     received in evidence.)

7  BY MR. MAHAN:

8      Q.   So you have a lot of findings here.

9      A.   Yes, sir.

10     Q.   What are the most--  Can you recall some of

11 the more striking findings, perhaps, or some of the

12 more compelling findings as you were doing your

13 report?

14     A.   As you see at the end of my report, I

15 put--these are minimum general life safety

16 violations.  I did not--  This is basically an

17 overview.  I did not put every single item as far as

18 electrical items, like those cords, I didn't go into

19 every room and document every time.

20     Q.   Okay.

21     A.   But the amount of items I saw in every room

22 electrically as far as drop cords, extension cords,

23 that was pretty severe, the amount of items I had

24 seen there.

25          Doors being locked.  Exit doors.  I think

183

1    it's--what was it, 120-some feet that was basically--

2    since you were locking all these doors, gave you a

3    dead-end corridor of 120-some feet, meaning you could

4    not have egress for over 120 feet because the doors

5    were locked.

6             And also see No. 3, if you look at No. 3, no

7    emergency policies in place.  That, to me, is very

8    big, because if you don't practice and have knowledge

9    of what to do in the case of an emergency, you have

10   the potential for having chaos and have no knowledge

11   of what is going to happen, or what you should do, so

12   if that--say, if the fire alarm did go off, would

13   people understand what it was, for one, and what they

14   were to do after that fire alarm went off, and

15   talking to the personnel on staff, they said they had

16   never done any type--had any type of emergency

17   procedures, so that could result in any type of an

18   emergency, not just fire, but that's, to me, is a

19   very glaring--as far as you don't have any type of

20   procedure in place if something did happen.

21            Locked doors, interior finish.

22       Q.   Let's break this down in categories.  Let's

23   think of category No. 1--

24       A.   Okay.

25       Q.   --things that make fire more likely, or make

1    it spread quickly.  What kind of things did you have

2    in that category?  Do you have anything in that

3    category?

4         A.   The interior finishes, because once you have

5    a fire going, there's nothing to put it out unless

6    it's a small--small enough fire extinguisher, you can

7    put it out.  That's if everybody is awake and the

8    fire is detected.

9         Q.   Okay.

10        A.   But you have a lot of combustibles in an

11   area, a lot of combustibles.

12        Q.   Okay.  And how about things that might

13   combust then?  Was there any concern along those

14   lines, electrical sources or--

15        A.   Well, you have the potential for an item

16   with the electrical problems.  Then you have how you

17   heated the facility.

18        Q.   Which was again--

19        A.   Again, the space heaters.  And then the fans

20   drawing it because if there was a fire, we're going

21   to have that just drafting that fire until the

22   electricity went out, so you'd have it blown and

23   pushing that fire throughout, so--

24        Q.   And then let's say there's a fire at night--

25        A.   Okay.

185

1      Q.      --in this facility that you inspected.  What

2   would you expect would happen based on your

3   inspection?

4      A.      What would I expect would happen?  If this

5   fire alarm went off and was working properly, you

6   know, people would--I would--if they heard it, get

7   up, but it's hard to--I don't want to say speculate,

8   but it's a very good chance that it could be pretty

9   detrimental because of knowing--depending on where

10  the fire was, and if, say, there's a fire in the area

11  of that middle corridor right outside, or say the

12  fire started in the housing of the person that

13  was--the staff that had the keys to the doors, and

14  they couldn't get out, and then it takes away the

15  egress.  You would have the potential, and I'm not

16  saying this is for sure, but you have the potential

17  to where you would not be able to egress out these

18  doors that are padlocked, and then if you are to take

19  out your egress, if you had fire in the area, it

20  would be egress where the only exit you have, nobody

21  can get out.

22          It just--I mean every fire is different.  So

23  you could have worst case scenario.  There is

24  potential for worst case scenario, to where nobody

25  would get out.  That exists, but it just would have

186

1   to depend on the circumstances.

2        Q.    Would you conclude, based on your findings,

3   that this was, indeed, an illegal set-up in terms of

4   fire safety?

5        A.    The reason for us closing it down is because

6   we deemed it unsafe.  We would not allow this

7   facility to operate in the--

8        Q.    So the fire marshal actually did close it

9   down?

10       A.    Yes.

11       Q.    What do you do to close it down?  What

12  action do you do?

13       A.    Just inform them that we were going to

14  be--going to have to find other avenues for these

15  gentlemen to live, because they were not--nobody was

16  going to be allowed to live there, meaning the

17  gentlemen that lived there, the residents that lived

18  there, or staff, it wasn't safe for--it was deemed

19  unsafe for anybody to occupy this building, so nobody

20  was to live there until all these items would be

21  completed, and then an inspection would have to be

22  done to say that it was safe to occupy this structure

23  again.

24            MR. MAHAN:  You Honor, Exhibit 90 is offered

25  into evidence.

# DEPARTMENT OF PUBLIC SAFETY
# FIRE MARSHAL'S INSPECTION DIVISION

| LOCATION | Atalissa | | | | |
|---|---|---|---|---|---|
| OCCUPANT | Henry's Turkey Service | COUNTY | Muscatine | DATE | 2/7/09 |
| OWNER | City of Atalissa | ADDRESS | 1145 Atalissa Rd., Atalissa, IA 52720 | | |
| AGENT | Kenneth Henry | ADDRESS | 123 3rd St., Atalissa, IA 52720 | | |
| | | ADDRESS | 511 U.S. HWY 84 West, Goldthwaite, TX 76844 | | |

WE HAVE INSPECTED THE ABOVE PREMISES AND FIND: a 2-story with basement facility at the above address and find the following life safety violations. The facility appeared to have three different construction types: Type III(000), Type II(000), and Type V(000).

## "Findings Include"

EXHIBIT

90

1. No evacuation maps were found throughout the facility.

2. There were no fire drill records completed. Based on an interview with the Maintenance Director, fire drills had not been conducted with staff or residents of the building.

3. There were no emergency policies or procedures in place. Based on an interview with the Maintenance Director, the occupants of the building, including staff, had no emergency procedures in place to follow in the event of an emergency.

4. This building was not equipped with a sprinkler system.

5. According to interview with facility staff, the Boiler had not worked since 2002. The facility had been using space heaters throughout the building to heat the facility since 2002.

6. According to interview with the Maintenance Director, there had been problems with the fire alarm the week prior to this inspection, and the fire alarm system was turned off for approximately one (1) week. Staff indicated the alarm was going off frequently due to the rate of rise heat detectors in the bathrooms. The fire alarm system was turned back on after state inspectors went through the building on Friday, 2/6/09.

7. The last time a documented fire alarm inspection was performed was on 1/15/2002 by Midwest Alarm. The batteries in the fire alarm indicated they were replaced on 2/8/07. The fire alarm system was not being inspected and tested in accordance with National Fire Protection Association (NFPA) 72, *National Fire Alarm Code.*.

8. The east end of the building revealed a corridor approximately 36.5 inches wide constructed of plywood that lead to a connected trailer on the south side, a connected trailer on the east side, and a storage garage on the north side. These areas failed to be protected by a sprinkler system and did not meet interior finish requirements.

9. There was no fire rated separation between the Garage on the North side of this east corridor. The only separation between this corridor and the Garage was wood and plywood construction, which would allow a fire to spread very quickly into sleeping areas.

10. The East Trailer corridor revealed the absence of any emergency light units with battery back up (secondary power).

11. The exit signs in the East Trailer were not in proper working order. These exit light units failed to illuminate at the time of inspection.

12. The end of the Trailer Corridor revealed combustible storage in the corridor by the exit door.

13. The East Trailer exit from the corridor revealed the door swung to the inside of the building and not with the direction of travel, as required.

14. The trailer on the south side of the East Corridor revealed a hasp latching device on the outside of the door that was not being used at the time of inspection. This trailer was occupied by 1 male adult and 2 children at the time of inspection. This trailer was equipped with only single station smoke detection. The south exit door from this trailer was blocked by mattresses and miscellaneous storage at the time of inspection.

15. The two (2) Resident Rooms on the south side of the North Garage revealed doors from the resident rooms that led directly into the garage. These resident room doors failed to be rated doors, and failed to be equipped with self-closing devices that have positive latching hardware. (The current setup would permit a fire to spread from the Garage area to the sleeping rooms very easily.)

16. The North Garage was not separated from the occupied building (resident sleeping rooms, administration office, and corridors) with a fire rated construction. The two (2) Resident Rooms and the Administrative Office on the south side of this garage revealed window air conditioners in the wall between the garage and occupied areas. This wall also revealed unprotected plywood and wood construction. (Typically, a two-hour rated firewall is required between garages and areas where residents would be sleeping.)

17. The south side of the building revealed another trailer (Southwest Trailer) that only exited into a corridor of the building. There failed to be a secondary exit from this trailer. This trailer did reveal a hardwired heat detector. The interior finish for this trailer was wood paneling. This trailer had a large quantity of combustible storage items throughout.

18. The Northeast corridor exit, exits directly into the North Garage. The North Garage is not separated with fire rated construction and there is no rated corridor through the garage. The exit from the North Garage revealed a plywood door (approximately 16 inches wide) between 2 overhead garage doors on the east side of the garage. The garage was large enough to store numerous vehicles, an enclosed trailer, a motor home, and various motorized equipment. There were liquid petroleum (LP) gas cylinders being stored in this garage as well.

19. The illuminated exit sign above the door to the East Trailer corridor failed to illuminate at the time of inspection.

20. Only one emergency light unit throughout the facility illuminated at the time of inspection. This was the right emergency light unit above the American Flag on the east wall of the Old Gymnasium.

21. The corridor walls and ceilings on the east side of the building (South of North Garage) revealed plywood interior finish. (Plywood, unless treated with a fire retardant material, does not meet flame spread requirements of the fire code).

22. The East Corridor on the south side of the North Garage revealed combustible items being stored in the corridor.

23. Corridor doors to all resident rooms throughout the facility revealed the absence of Underwriter's Laboratory (U.L.) labeled positive latching hardware. Positive latching door hardware enables a door to remain in the closed position in the event of a fire.

24. Resident Room #15 revealed no observable detection (smoke/heat detectors) in the room. This room also revealed unprotected wood construction.

25. The Second Floor was not occupied at the time of inspection. The double set of doors to the Second Floor were screwed shut. According to Staff, the last time the Second Floor was occupied was November of 2008. There was no lighting on the Second Floor at the time of inspection. The secondary exit from the Second Floor was covered with insulation. The secondary exit came off the Second Floor of the building on the east side and was approximately 24 inches wide, which fails to meet fire code requirements. Observations at the time of inspection revealed there were still beds and furniture set up on the second floor.

26. There was no separation from the 1st Floor of the Original School Building and the Lower Level of the Original School Building. The absence of rated separation between the floors would prevent a fire from being contained to one section of the building. The current set up of the building would allow a fire to spread quickly from the lower level to the 1st floor.

27. The Northeast wall of the 1st Floor revealed a pull station for the building's fire alarm system that was approximately 9 foot off of the floor. (The maximum height of a pull station allowed by code is 4 ½ feet per NFPA 72, *National Fire Alarm Code*.)

28. The smoke detector at the east end of the 1st Floor revealed a paint like substance on the detector.

29. The east end of the 1st Floor revealed exposed electrical wiring. This wiring failed to be installed and secured in accordance with National Fire Protection Association (NFPA) 70, *National Electric Code*.

30. The ceilings and walls throughout the facility revealed numerous holes and penetrations. Fire can easily spread through these openings.

31. The Fire Marshal's Office does not allow electrical adapters, extension cords, and drop cords. Surge protectors shall be metal encased, be equipped with a 15 amp breaker, and a 14 gauge cord. Surge protectors shall only be used with computer equipment and audio/visual equipment. Observations from the 2/07/09 inspection revealed almost every resident room and numerous areas throughout the facility had such devices in use.

32. The exit sign above the west exit door failed to illuminate at the time of inspection.

33. The West Exit Door revealed a bolt latch going into the door frame. The bolt latch was equipped with a deadbolt lock which would prevent the door from being opened from the inside of the building without the use of a key.

34. The West Exit Stairs revealed no railing.

App - 916

35. The next closest exit door to the West Exit Door was the South Exit Door (Approximately 90 feet away from the West Exit) and it was secured with a bolt latch into the door frame. The South Exit Door would not open because it was sticking at the bottom. Outside this exit revealed a chain link gate or fence approximately 5 to 6 feet away from the exit door.

36. The Northwest Exit Door revealed a bolt latch going into the door frame with a keyed padlock on the bolt latch so the door could not be opened from the inside without the use of a key.

37. The nearest operational exit door from the locked West Exit door was the Northeast Exit Door (approximately 127 feet away from the West Exit Door). This would create a 127 foot dead end corridor from sleeping rooms located by the west exit door to the nearest exit. In addition, an occupant near the west exit door would be required to pass through three (3) sets of stairs to reach the next working exit door.

38. Storage Room #14 revealed a panel door with numerous round holes in the door. This door was secured with a hasp and keyed padlock. Storage room doors are required to be 1-hour rated in non-sprinklered buildings. Storage room doors also require self-closing devices and positive latching door hardware.

39. The Laundry Room/Boiler Room door revealed the absence of Underwriter's Laboratory (U.L.) labeled positive latching door hardware.

40. There was no separation of combustible storage items from the Boilers in the Laundry/Boiler Room. The Boilers were not in operation at the time of inspection and according to staff the boilers had not worked since 2002. Staff also acknowledged the space heaters had been heating the building since the boilers stopped working in 2002.

41. The electrical outlet behind the dryer on the east wall of the Laundry Room revealed scorch marks on the outlet. The outlet had not been replaced.

42. Evidence indicated by an ashtray in a staff (occupant) room, revealed persons had been smoking in the building.

43. Numerous heat detectors throughout the building revealed paint, corrosion, or rust on the detectors. The National Fire Protection Association (NFPA) 72, *National Fire Alarm Code*, indicates detectors in this condition shall be replaced.

44. The Northwest Exit Corridor and South Exit Corridor revealed the absence of emergency lighting and illuminated exit signs (equipped with battery back up) to indicate the path of egress.

45. The Old Gymnasium/T.V. Lounge revealed there was no separation between the corridor and this large room for egress purposes. A one-hour rated corridor would be required for this type of occupancy that is not sprinkled. All rooms and open spaces are required to be separated from the corridor by one-hour fire rated construction.

46. The Old Gymnasium/T.V. Lounge revealed the entire ceiling interior finish was pink insulation board. This insulation board is typically manufactured of petroleum based products and does not meet interior finish requirements for flame spread.

47. The Dining Room revealed wood paneling interior finish on the walls and ceiling. Wood paneling, unless treated with a flame retardant material, does not meet interior finish requirements.

48. The Dining Room revealed the absence of illuminated exit signs (equipped with battery back up) above the exit doors.

49. The Dining Room revealed the absence of emergency light units with battery back up (secondary power in the event of a power loss).

50. The direct exit from the Dining Room was locked with a thumb style latching device and there was no clear path to the public way (Path was blocked).

51. Fire extinguishers throughout the facility revealed the absence of documentation showing monthly visual inspections that were performed as required by National Fire Protection Association (NFPA) 10, *Standard for Portable Fire Extinguishers*.

52. Record review and interview of facility staff indicated the suppression system for the range hood in the Kitchen failed to be connected to the building's fire alarm as required by the National Fire Protection Association Standard 96, *Standard for Ventilation Control and Fire Protection of Commercial Cooking Operations*. The hood system over the commercial stove in the Kitchen also revealed numerous round holes on the north end of the hood. The stove and hood system revealed a large amount of grease build up. Observation revealed there was no K Class fire extinguisher in the Kitchen to supplement the suppression system for the range hood as required by NFPA 96.

53. The North Kitchen door revealed a thumb latch style dead bolt and the absence of Underwriter's Laboratory (U.L.) labeled positive latching door hardware.

54. The East Kitchen door revealed the absence of Underwriter's Laboratory (U.L.) labeled positive latching door hardware and a (U.L.) labeled self-closing device.

55. The Kitchen Floor revealed rubber mats covering wood flooring. There appeared to be a grease like film throughout the Kitchen floor and sections of the floor that were weakening.

56. There appeared to be no detection (connected to the building fire alarm system) within the Kitchen.

57. The meat grinding machine in the Kitchen revealed a frayed electrical cord.

58. The Kitchen revealed 2 electrical outlets on the south wall covered with blue corrosion.

59. The east wall of the Kitchen revealed a paint like substance on the horn/strobe notification device.

**Reminder: These are minimum general life safety violations. Based on the classification of the building and the occupants of the building the life safety violations may be more severe and widespread based on the code that is applicable.**

| CORRECT ABOVE CONDITIONS BY | The above facility (building) shall not be occupied until written permission is granted from a representative of the Iowa State Fire Marshals Office. |
|---|---|
| DATE OF COMPLIANCE | |
| | DEPUTY FIRE MARSHAL  Kyle R. Gorsh #776 |
| OCCUPANT  Henry's Turkey Service, Atalissa | DEPUTY FIRE MARSHAL  Justin L. Wade #723 |
| PLEASE NOTIFY THE OFFICE OF FIRE MARSHAL UPON COMPLIANCE | |

State Fire Marshal  215 E. 7th St.  Des Moines , Iowa 50319   App - 918

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) ) | 3:11-CV-00041-CRW-TJS |
| HILL COUNTRY FARMS, INC., d/b/a HENRY'S TURKEY SERVICE, | ) ) ) | |
| Defendant. | ) ) ) | |

DECLARATION OF SUE A. GANT, PHD.

I, Dr. Sue A.Gant, do hereby state as follows:

I am a Doctor of developmental psychology and human learning and behavior analysis specializing in program development and evaluation of support services for persons with intellectual and developmental disabilities. A statement of my qualifications as a court-qualified expert and a curriculum vitae are attached as Exhibit A.

I have been consulted by the U.S. Equal Employment Opportunity Commission to evaluate evidence in a matter pertaining to the employer-employee relationship between a Texas-based company, Hill Country Farms, Inc., which was doing business as Henry's Turkey Service ("HCF/HTS") in Iowa, and 32 disabled workers who were performing turkey processing (evisceration) duties and other work as assigned in West Liberty and Atalissa, Iowa for a time

App - 919

period which includes 2006 through February 2009. I have also evaluated how the nature of this employment relationship impacted the wages and other financial benefits of these disabled workers.

Upon my review of all the evidence, including, but not limited to: interviews with a majority of the specific victims; interviews of state case workers from the Iowa Department of Human Services; meetings with service providers; personal study of case files and medical assessments pertaining to the disabled workers; reviews of reports and materials generated by Iowa state officials; reading of the deposition and hearings testimony of HCF/HTS officers; and consultation with colleagues in my field of expertise, I have reached certain opinions and conclusions about the treatment of the disabled men who worked for HCF/HTS.

I have prepared and provided an expert report in this case that was produced to the Defendant during discovery, but which I continue to supplement with additional information, sources, and opinions as my work continues. For the specific purposes of this declaration, and the motion being filed by the EEOC, I am attaching a section of a report, Exhibit B, which I have prepared and will continue to supplement as appropriate. This section, which pertains to the claims of wage violations and Financial Exploitation, reflects my opinions and conclusions based on the evidence which I have reviewed. My opinions and conclusions as to the relationship between HCF/HTS and its disabled workers, and the employer's pay and compensation practices are contained therein.

I, Sue A. Gant, declare under penalty of perjury that the foregoing statements are true and correct.

Executed this 25th day of June 2012

Sue A. Gant

## QUALIFICATIONS TO OFFER EXPERT OPINION
Sue A. Gant, Ph.D.

I am an independent consultant residing in Hawarden Iowa. I am a Doctor of developmental psychology and human learning and behavior analysis specializing in program development and evaluation of services for persons with developmental disabilities.

I am qualified to offer an expert opinion as I have extensive expertise in the field of developmental disabilities.

I have extensive experience and professional expertise with regard to the provision of adequate and appropriate protections, supports, and services, in community settings, to persons with intellectual disability and/or other developmental disabilities, including persons with dual diagnosis of a developmental disability and co-occurring mental illness. I have worked with individuals from a broad range of age groups and with a wide variety of disabilities, including those persons with extensive health care and/or behavior challenges. Over the years I have provided direct service and technical systems and/or quality review and monitoring with regard to both individual and systemic matters, on behalf of interested actors on all sides, including persons with developmental disabilities, families, advocates, community providers, the federal government, several state/territorial governments (including Connecticut, Kentucky, Massachusetts, New Mexico and the US Virgin Islands), as well as a number of federal, state, and local courts. Typically, my work relates to protections from harm, the provision of habilitation services, education and training, behavior supports, risk management, quality assurance, and discharge planning.

I am the Vice-President of the consulting firm Gant, Yackel & Associates Inc. I have over 30 years' experience working in the field of developmental disabilities. I have a Doctorate in Educational Psychology from Southern Illinois University, specializing in Developmental Disabilities Program Development and Evaluation. I worked at a public facility for persons with developmentally disability in Illinois and in Connecticut served as Executive Assistant to the Commissioner for Mental Retardation by directing the Division of Quality Assurance. I have extensive familiarity with standards of care applicable to segregated institutional settings and integrated community services for individuals with developmental disability. I have taught university-level courses in education, special education, and educational psychology. I have been appointed by U.S. District Courts to serve as Monitor, Special Master, and Expert to the Court in cases involving people with developmental disabilities institutionalized and returning to their communities. These cases include Lelsz v. Kavanagh, C.A. -3-85-2462 A. (N.D. Tx.), United States v. Oregon, No. CV-86-961-LE (D. Or.) and Gary W. v. Louisiana, C.A. No. 74-2412 (E.D. La.) and Jackson v. Ft Stanton, C.A. No. 87-0839, D. NM. ) I have acted as consultant and expert witness for the United States Department of Justice (DOJ), Civil Rights Division in actions under the Civil Rights of Institutionalized Persons Act (CRIPA) and the American Disabilities Act (ADA).

I have conducted thousands of evaluations and crafted remedial plans for individual and system reform in Illinois, New York, Louisiana, Michigan, Connecticut, Iowa, New

App - 922

Exhibit A

Mexico, Arkansas, Maryland, Oregon, Utah, Washington, Texas, Indiana, Virginia, California, and Georgia. As a Program Associate with the Willowbrook Review Panel, the Court appointed Monitors in New York Association of Retarded Citizens v. Carey, I was responsible for monitoring care and treatment and discharge/placement planning of thousands of Willowbrook class members that resided in six (6) public facilities and were moving to community integrated settings. I developed policy and procedures and evaluation tools in conjunction with New York government employees; evaluated policy implementation; constructed remedial plans to address deficient practices; monitored implementation of the remedial plans; and provided periodic status reports to the Court.

As part of my professional experience, I have reviewed case records for thousands of individuals with intellectual and/or developmental disabilities in congregate and segregated settings and integrated community residential and employment environments. I have also attended and participated in Individual Support Plans (ISPs)[1] meetings. I am extensively familiar with the supports and services, which are generally provided to individuals with intellectual and/or developmental disabilities.

I have also analyzed thousands of ISPs to determine if the individual and their guardian participated in the ISP development meeting; whether the Interdisciplinary Team (IDT) was appropriately constituted with representation from all of the individual's service providers including professionals, paraprofessionals and nonprofessionals; if comprehensive assessments were completed and results integrated into the ISP; whether the IDT exercised professional judgment; and if all required supports and services were addressed in discharge planning. I have evaluated thousands of individual discharge and transition plans for community placement to determine if essential supports and services were identified and have monitored implementation of the plans to ensure a safe transition from institution to the community.

Federal and State Courts have qualified me as an expert in services for individuals with intellectual and/or developmental disabilities.

---

[1]   ISP is synonymous with Overall Plan of Service (OPS)

# Curriculum Vitae

Sue A. Gant, Ph.D.
Gant, Yackel & Associates Inc.
2015 Parkview Dr.
Hawarden, IA 51023

FID # 06-1150626
Tel: (712) 551-3979
Fax: (712) 551-3758

## Education

| | |
|---|---|
| 9/64 - 6/67 | West Sioux Community High School, Hawarden, Iowa. Awarded Diploma. |
| 9/67 - 1/69 | University of Northern Iowa, 48 semester hours: Emphasis: Mental Retardation and Physical Therapy. |
| 1/69 - 6/71 | University of South Dakota, Mental Retardation and Special Education. Awarded B.A. |
| 6/71 - 8/71 | University of South Dakota, 12 semester hours: Graduate level; Emphasis: Mental Retardation. |
| 9/71 - 8/72 | Southern Illinois University, Therapeutic Recreation, Developmental Disabilities. Awarded M.S. |
| 6/74 - 5/78 | Southern Illinois University, 113 semester hours: Educational Psychology - Human Learning and Behavior Analysis; Developmental Disabilities Program Development and Evaluation. Awarded Ph.D. |
| 1/89 | Connecticut Department of Administrative Services, 24 hours: Course in Labor Relations. Certificate |
| 3/89 | Aboud & Associates Inc., Albany, New York, 24 hour Course: Conducting Abuse Investigations: Certificate |
| 1989-2011 | CEUs from annual conference, workshops and training institutes. A sample of other postgraduate educational experiences by subject matter can be found in the training section of this resume. |

## Experience

| | |
|---|---|
| 9/89- Present | Employed by Gant, Yackel & Associates Inc. as a consultant in human service matters with specialization in program development and evaluation, monitoring civil rights litigation and policy analysis. |

App - 924

Sue A. Gant, Ph.D.         Curriculum Vitae
Page 2 of 23                May 10, 2011

---

12/07-Present      <u>Rule 706 Expert</u> to the Court in ***Jackson et. al. vs. Fort Stanton et. al,*** (Civil Action No. 87-0839), Honorable James P. Parker, United States District Court for District of New Mexico.

Under the Federal Rules of Evidence the trial Judge has the inherent powers to appoint expert witnesses. In December 2007 I was appointed by Judge Parker to assess the State of New Mexico's compliance with several court orders and stipulated agreements to ensure that the State of New Mexico meets the individualized needs of a class of New Mexico citizens with developmental disabilities and facilitate efforts of the parties to achieve compliance with the orders. The ***Jackson*** class action involved a class of approximately 500 individuals with developmental disabilities, who were institutionalized at the Los Lunas or Fort Stanton Training School. There are approximately 320 living class members that now reside in small community settings throughout New Mexico. New Mexico community services are funded through the Medicaid Home and Community Based Waiver (HCBW). Class members are adults with developmental disabilities and handicapping conditions including complex medical needs, behavioral and psychiatric challenges, and sensory, physical and intellectual impairments.

4/95-2/00       <u>Federal Court Monitor</u> in the matter of the ***United States of America vs. State of Oregon.***

In April 1995 the parties agreed to my appointment to oversee the implementation of a 1987 consent decree about conditions at Fairview Training Center. My responsibilities included monthly review of individual class members who were at significant risk of harm, consultation to interdisciplinary teams, and compliance monitoring. In addition, I monitored the development and implementation of discharge planning for community placement and provided guidance to the management of this 600-bed institution. The Legislature passed a budget June 1997 that supported facility closure by the year 2000. Many improvements in the care and treatment of individuals at this facility occurred over the years. The facility had a sound behavior support policy and became restraint free for a number of years. Discharge to community settings progressed with a census of 225 people in 12/98 and the last person was placed in February 2000. Many of the last persons to be placed required extraordinary supports due to challenging psychiatric illnesses and/or complex medical needs.

10/95-5/96      <u>Mental Health Counselor</u> for United States Virgin Islands Territorial Government to aid the Federal Emergency Management Agency in supporting hurricane Marilyn victims.

Provided direct support to hurricane victims and supervised outreach workers who provided services to private citizens in their homes and students and teachers in public schools.

1/87 - 9/89    Executive Assistant to the Commissioner of the Connecticut Department of Mental Retardation (DMR) with 9,000 recipients.

Directed the staff and operations of the DMR Quality Assurance Division; reviewed facility and community based residential and day programs for quality and recommended strategies for quality improvement and regulatory compliance; system of quality assurance addressed service planning, service delivery, health and safety, participant rights and safeguards, and financial/program accountability for services delivered by licensed residential providers, and contracted supported living, day services, and supported employment to all individuals supported by DMR; Program Quality Reviews by self advocates, community members, and DMR staff; Regional and State level Mortality Review; formulated program goals and objectives; developed or assisted in the development of related policy and regulations; monitored plans and policy to conform to federal, and state accreditation standards; interpreted and administered pertinent laws; evaluated staff; planned and implemented through research the reporting and analysis of data compiled on the quality of life experienced by recipients of services. In consultation with contractor, Touche Ross Consulting, participated in the development of CAMRIS (Connecticut Automated Mental Retardation Information System), DMR's internal mainframe data management system; designed data menus and reports to be generated through CAMRIS. Reports used to monitor quality of DMR services. Produced reports and presented to the Court compliance status in *Connecticut Association for Retarded Citizens v. Thorne* (Implementation Plan status- community services development) and *United States of America v. State of Connecticut* (improvement in conditions at one large segregated facility).

11/80 - 1/87    Special Master - *Gary W. et al v. State of Louisiana* (C.A. 74-3812). Honorable Robert F. Collins United States District Court, Eastern District of Louisiana.

Served as an expert to the Court to ensure implementation of the Court's 1976 Order in the matter of *Gary W.* (Texas Children's Case) that mandated the return of 684 poor and/or handicapped Louisiana children placed in Texas facilities to their home state. Placement was to have been accomplished using the legal principle of "least restrictive" environment and planning was to have been predicated on individual assessment results. The 684 class members, mostly young adults by 1980, had characteristics including mental retardation of varying degrees of severity; multiple handicapping conditions complicated by medical involvement and seizure disorders; emotional disturbance; chronic mental illness with some individuals in forensic mental health centers found to be incompetent to stand trial, while others were serving time in Louisiana juvenile detention centers and adult penal institutions. Because of the nature of the Court's Order, exercised expertise in program development, case management, parent counseling, developmental assessment, behavior analysis, program evaluation, and systems review. Worked closely with Louisiana state officials around systems reform to ensure remedial

actions had a lasting effect; Service Provider and Professional organizations; the advocacy community and the Plaintiffs' counsel from Children's Defense Fund and Intervenor-United States Department of Justice. Conducted fact finding that included individual class member status and compliance status, produced reports to the court, issued formal (binding) and informal recommendations, held conferences with the parties, and negotiated stipulated settlement agreements.

10/78 -11/80   Program Associate, *New York Association of Retarded Citizens, et al v. Carey, et al.* U. S. District Court, Eastern District of New York, Willowbrook Review Panel, New York, New York. Honorable John Bartells

Under the professional direction of the Willowbrook Review Panel, a seven member Court appointed panel comprised of nationally recognized experts in the field of developmental disabilities, and under the general direction of the Review Panel Executive Director, provided professional services and consultation to parties involved in this class action suit. Class members totaled 5400 persons of all ages and who were disabled residing at Willowbrook Developmental Center on Staten Island. The consent judgment was signed in 1972, whereas the parties agreed to relocate these individuals into small, homelike community settings and to provide necessary support services including educational, vocational, and health and therapy services. Individual assessment results were the basis for provision of services. Parental involvement, protection of rights and the practice of exercising instrumental due process were closely monitored. Responsibilities included monitoring a Court ordered community placement plan by writing standards that were then applied to assess defendants' compliance with said order. During this time 2500 of the 5200 class members were living in the community in settings less restrictive than "Willowbrook". These individuals experienced various types of developmental disabilities including mental retardation, cerebral palsy, seizure disorders, multiple handicapping conditions, and visual and hearing impairments due to massive and inhumane research of Rubella, and Hepatitis B. Many individuals also had psychiatric problems including behavior disorders.

Expertise in program evaluation, behavior analysis, individual assessment, program design, policy analysis, systems review, and parent counseling was exercised. Activities included the design of data collection instruments and survey procedures; collection of data, report writing and ongoing technical assistance in matters pertaining to compliance with the Consent Judgment. Recommendations were made to the Court when corrective actions by the defendants were required. I witnessed hundreds of persons with disabilities living successfully in the community.

My work involving Willowbrook class members is cited in David and Sheila Rothmans' book, Willowbrook Wars: A Decade of Struggle for Social Justice, that traces the history of reforms and litigation at the infamous Willowbrook State School from 1972 to 1983.

8/76 - 10/78          <u>Behavior Analyst</u> - Anna Developmental Learning Center, Anna, Illinois.

                      Anna Developmental Center was an Illinois state operated facility committed to
                      quality services that served 150 individuals who were developmentally disabled.
                      Handicapping conditions of those individuals being served consisted of varying
                      degrees of mental retardation, multiple handicapping conditions, and emotional
                      disturbance.

                      This program was accredited by the Accreditation Council of Facilities For the
                      Mentally Retarded and Developmentally Disabled and was certified as an
                      Intermediate Care Facility for the Mentally Retarded receiving Title XIX Medicaid
                      Funds. Under the general direction of nationally known behavior specialists,
                      developed and managed a behavior management team that provided assistance in
                      the design and implementation of behavior management programs in this
                      progressive behavioral research oriented facility. Provided technical assistance to
                      parents and community programs in the design and implementation of behavior
                      management programs for individuals of varying handicapping conditions.
                      Participated in the design of apartment living programs and sheltered employment
                      options; and worked closely with psychopharmacologists and nutritionists in a
                      project to reduce the use of certain psychotropic and behavior modifying drugs.

1974-1977             <u>Development Assistant</u> of the Anna Behavioral Profile, a system to assess adaptive
                      behavior and plan supports and services based on assessment results. Anna,
                      Illinois.

8/76 - 10/76          <u>Team Leader</u> - Anna Developmental Learning Center, Anna, Illinois. Under the
                      direction of Anna Developmental Learning Center's living units coordinator, and
                      as an experienced professional, supervised and directed 15 staff, engaged in
                      activities of applying the principles and techniques of behavioral sciences to the
                      observation, evaluation, development of procedures and care of 30 young adults
                      who are severely and profoundly retarded.

5/76 - 8/76           <u>Program Coordinator</u> - Under general supervision of the Anna Developmental
                      Learning Center's administrator, supervised and coordinated the activities of
                      specialized program service areas, including recreation, education, hearing, speech
                      and religious services. Responsible for the coordination and integration of
                      specialized services into a cohesive program, ensuring cooperation and
                      communication between the various service areas.

2/76 - 5/76           Under the direction of the Anna Developmental Learning Center's living units
                      coordinator, and as an experienced professional, supervised and directed 18 staff,
                      engaged in activities of applying the principles and techniques of behavioral
                      sciences to the observation, evaluation, development of procedures and care of 25
                      young adults who are mild and moderately retarded young adults.

Sue A. Gant, Ph.D.                     Curriculum Vitae
Page 6 of 23                           May 10, 2011

9/76 - 1/77      <u>Counselor</u> Southern Illinois Clinical Services, Southern Illinois University,
                 Carbondale, Illinois. (Counseling Internship) Sample of cases:

                 - Acutely, emotionally disturbed 13 year old female, utilizing a cognitive
                   behavioral therapy approach.
                 - An 8-year-old child with Down Syndrome and her parents using a
                   behavioral approach for weight control.

8/74-5/76  <u>Program Specialist</u> Anna Mental Health and Developmental Center, Anna, Illinois

                 Responsible for developing social skills and personal care programs for severely
                 and profoundly disabled individuals using applied behavior analysis to measure
                 staff performance and skill development outcomes. Worked closely with Anna
                 Behavior Research Institute nationally recognized researchers in methodology
                 design, data collection and analysis. Toilet training and replacing maladaptive
                 behaviors with new positive behaviors by expanding repertoires of
                 institutionalized adults, was the focus of our work.  Eliminating socially
                 unacceptable behaviors provided opportunities for community acceptance.

                 Worked with chronically mentally ill patients to improve personal hygiene using
                 applied behavior analysis. Measurable outcomes included improvements in the
                 patient's self esteem, participation in treatment goals, and positive movement
                 toward out patient services.

                 Worked with acute mentally ill young adults (some also mentally
                 retarded/physically disabled) using applied behavior analysis to teach independent
                 living skills, coping strategies, and biofeedback techniques.

6/74 - 8/74      <u>Educational Leave of Absence:</u> Special Education Department: Southern Illinois
                 University at Carbondale, Illinois, Continuing Education; Eight week European
                 study tour.

                 I was one of 18 U. S. representatives who visited 50 facilities for person's who are
                 physically and mentally handicapped in nine Western European countries. The
                 "Normalization Principle" by Bank Mikkleson, a parent and pioneer, advocating
                 for equal rights of individuals with intellectual disabilities, was the study's
                 academic focus and emphasis in seminars and written educational materials. Each
                 country's health, education and welfare dignitaries shared educational and social
                 service information such as organizational methods, service distribution structures,
                 types of program delivery systems and accountability measures. Social service,
                 health care and educational programs for individuals with various types of
                 disabilities and their respective support needs were examined. Meetings were held
                 with parent associations, peer and advocacy support groups, professional trade
                 group representatives, and direct support caregivers. We attended a UNESCO
                 conference and shared with participants our professional experiences in the US.
                 Site visits included Montessori schools, public and private community residential
                 programs, and Anthroposophic homes, schools, and villages seen to provide a

positive alternative to traditional forms of institutional care; facilities for individuals with special needs- hospitals, rehabilitation centers, prisons, a Leper colony and Dachau. Upon return to the United States was a member of a panel presentation at United Nations, to exchange information and professional experiences gained from the study tour. Final exam: Essay- Based on what you have learned-How will you, within your profession, effectuate systems change? How will you know if you made a difference?

9/73 - 6/74  Activity Therapist 1 (Reassignment) Anna Mental Health and Developmental Center, Anna, Illinois

Under general supervision of the Anna developmental learning center's program coordinator, was responsible for meeting the socio-recreational program needs of 50 persons who were developmentally disabled. Ages ranged from 7-13 years on one living unit and 13-40 years of age on another.

8/72 - 9/73  Activity Therapist 1 Anna Mental Health and Developmental Center, Anna, Illinois.

Responsible for the planning, implementation and evaluation of therapeutic socio/recreational programs for adults who were mentally ill and resided on an admissions unit. Served as a member of a diagnostic treatment team that utilized a multi-disciplinary approach.

8/72 - 11/72  Health Educator, Southern Illinois Migrant Worker's Council, Mobil Health Clinic, Cobden, Illinois.

Served as a health educator, teaching Mexican-American migrant workers and their families' basic health care, prenatal and child care routines, cooking skills, and alternative uses to leisure.

9/72 - 6/72  Program Coordinator, Styrest Nursing Home, Carbondale, Illinois.

Coordinated programs for residents of this facility who were of a geriatric age and/or chronically mentally ill. Assisted in the program development of a 72-bed wing for children who were multi-handicapped and medically involved. This wing served children who were Illinois citizens that were being returned to Illinois from out of state placement. Coordinated the medical team and other disciplines to assure transfer trauma was minimized during relocation to this Illinois facility.

10/71 - 3/72  Social Skills Trainer, Federal Grant: Anna Mental Health & Developmental Center, Anna, Illinois.

Planned and implemented social skills training and recreational programs for adults who are were severely mentally ill and others who were mentally retarded.

Participated in toilet training programs, token economies, and applied behavior analysis.

11/70-5/71      Teacher's Aide, Vermilion Public School System, Vermilion, South Dakota.

Teacher's Aide in a segregated learning disabilities classroom in a public elementary school. Teacher's aide in a special education resource-learning center. Students' age ranged from 8 months to 10 years. Twenty-four students rotated through this classroom where activities were individually designed based on developmental assessment results. Responsible for motor skill and visual perception assessments and the design of activities to ameliorate problems. Specifically assigned to 3 infants, 2 with Down Syndrome and 2 ten year olds who were mildly handicapped.

## Academic Experience

2011            Guest Lecturer, Law School, University of South Dakota, Disability Law Class Actions

2011            Adjunct Professor, Department of Education, University of South Dakota: Graduate level: Independent Studies

2010            Guest Lecturer, University of the Virgin Islands Institute for Persons with Developmental Disabilities (DD), Dual Diagnosis: DD and Mental Illness

2007            Adjunct Professor, Department of Education, University of South Dakota: Graduate level: Independent Studies

2002-2004       Adjunct Professor, Department of Education, Dordt College, Sioux Center, Iowa Taught undergraduate level courses: Methods and Strategies for the Instruction of Severely Handicapped Students, Supervised Community Service and Field Experiences-Juvenile Detention Center, Residential Treatment Center, Medicaid Home and Community Based Waiver-supported living and employment and family support (Respite services); Regular and Special Education Class Rooms and public and private Day Care.

1/01-9/01       Adjunct Professor, University of Virgin Islands, St. Thomas and St. Croix, USVI. Project Coordinator - "Full Inclusion"; Teams of teachers and administrators learned strategies for providing support to students and school personnel during integration into regular school activities. Responsibilities included training institutes, teaching, and providing direct support at public schools on all three islands.

2/00-6/00;      Adjunct Professor, University of Virgin Islands, St. Thomas and St. Croix, USVI.
9/00-1/01       Taught graduate course in assistive technology for persons with disabilities. Students were full time public employees of the Departments of General and

App - 931

Special Education, Early Childhood, Vocational Rehabilitation, and Aging. This course was team taught with national consultants and professors from Temple University Institute for Developmental Disabilities. Supervised field experience and provided government agencies technical assistance.

1/87-5/89    Professor, Department of Special Education, Central Connecticut State College, New Britain, CT.
Taught five (5) semesters graduate and undergraduate level courses: Individualized Instruction for Severely Handicapped Students, Individualized Assessment of Severely Handicapped Students, Educating the Exceptional Learner, and Introduction to Autism.

## Consulting Experience

Sioux Center, Iowa, Public School; Positive Behavioral Supports: Special Education Students with Severe Reputations, 2009-2010.

Woodfield Center: Beresford, South Dakota. Behavioral Consultant, 2007.

Human Resources Group: Commonwealth of Kentucky, Cabinet for Health & Family Services, Department for Mental Health & Mental Retardation. Risk Management consultant as required by Memorandum of Understanding (MOU) between the United States of America and the Commonwealth and the MOU Strategic Action Plan in the matter of Oakwood Communities. Evaluated quality of services, participated in the review of individual and system risk factors, provided technical assistance in the design and implementation of the Quality Improvement Program and provided management with recommendations to reduce risks. September 2005-March 2006.

Virginia Office Protection and Advocacy. Evaluated quality of services and analyzed risk management activities at a public institution for individuals with developmental disabilities. 2005

Lutheran Social Services of the Virgin Islands. Evaluate quality of services and provide technical assistance and staff training. Programs included services for children and adults with psychiatric issues and/or developmental disabilities. June 2000 - August 2001.

United States Virgin Islands Territorial Government, Department of Human Services-Division of Vocational Rehabilitation. Evaluate challenging clients and provide counselors assistance in the development of appropriate Vocational Rehabilitation Plans. May, 2000-August 2000.

United States Virgin Islands Territorial Government, Department of Human Services-Division of Vocational Rehabilitation. Mediator. Resolve matters contested by vocational rehabilitation clients and their advocates. September 2000.

University of the Virgin Islands Affiliated Program for Persons with Disabilities. Conducted workshops for seniors and assistive technology on St. Thomas and St. Croix. May 2000.

Southern Legal Counsel, Gainesville, Florida. Evaluate adequacy of State of Florida Department of Health and Rehabilitative Services (HRS), Psychotropic Medication Regulation For HRS Institutions; Provide guidance towards revisions that conform to contemporary medication management practices and safeguards to protect against harm. The development and implementation of this regulation was developed as remedy to a wrongful death in *LeClair v. Williams*, Case No. 81-0008 MMP, United District Court, Northern District of Florida, Gainesville District. October 1999-2001.

Southern Legal Counsel, Gainesville, Florida. Evaluate conditions at unit at Northeast Florida State Hospital for persons with dual diagnosis of mental illness and mental retardation; Evaluate needs of individual class members of *Armstead vs. Coler* (Case No. 84-96-CIV-J-12, United District Court of Florida, Jacksonville Division) and make recommendations to the team; Monitor placement planning process and evaluate adequacy of community placement within 6 months of discharge. October 1999 - Present.

Florida Advocacy Center Inc., Fort Lauderdale, Florida. Evaluated quality of community placements funded by the Medicaid Community Based Waiver. September-1999.

Center for Public Representation, Northampton, Massachusetts. Analyzed the New Mexico defendant's proposed plan for disengagement of the *Jackson v. Ft. Stanton* matter. Reviewed and commented on the plan for provision of community based behavior supports and assistive technology to former institutionalized New Mexicans who are developmentally disabled, June, 1997. The Fort Stanton facility closed in September 1994 and Los Lunas State Hospital closed June 1997.

Seven (7) attorneys of the New Mexico Trial Lawyers Association who represented six (6) plaintiffs in *Botello v. Las Vegas State Hospital.* Conducted evaluations and worked with facility teams to develop recommendations and plans for community placement. 1994 until settlement in 1996.

Center for Public Representation. Participant in a planning workshop to conduct a review of the effects of the 1976 Brewster (Northampton, Mass. State Hospital) v. Dukakis lawsuit and develop strategies for enhancing services and supports to persons with disabilities the next decade, November, 1996.

Center of Public Representation. Evaluated conditions at Dever State School and select community residences; and evaluated the community placement planning process, December 1995.

Massachusetts Attorney General, Special Counsel to the Governor and Commissioner of Mental Retardation Services. Evaluated Wrentham and Fernald institutions for persons with developmental disabilities; Discussed solutions to resolve protracted litigation. November 1995.

Wyoming Advocacy Inc. Evaluated the state's community program, the de- institutionalization process and the conditions at the only public institution. Provided guidance in the development of a Quality Assurance Implementation Group as a remedy for the Court's disengagement in the matter of Lander Training Center, August-October 1994.

New Mexico Protection and Advocacy Inc. Evaluated the defendant's placement planning process in *Jackson v. Ft. Stanton*, December 1993.

Center of Public Representation. Analyzed consumer injuries at a Massachusetts public institution. The analysis and recommendations about quality assurance safeguards was shared with the facility administrator. Many of the recommendations were implemented. 1993.

North Dakota Association of Retarded Citizens. Evaluated North Dakota's community programs, the State's quality management system and conditions at the only public institution. 1992-1993. Provided testimony about compliance status with the Court's orders.

Utah Protection & Advocacy Center. Evaluated facility quality assurance system and placement planning procedures at a public institution; Evaluated draft consent decree for de-institutionalization in the matter *of Pannet v. Angus*. 1993.

Iowa Protection and Advocacy Center. Evaluated conditions at two public institutions in June 1992 and July 1993 in the matter of *Connor v. Branstad*. Provided recommendations for a settlement agreement. Settled in July 1994.

Arizona Inspector General Office and Conroy, Feinstein & Associates. Evaluated the quality of Arizona's Title XIX (Medicaid) waiver for home and community based programs. Recipients included children with complex medical needs living at home. 1992.

Texas Department of Mental Health and Mental Retardation Task Force in the design of a Quality Assurance system to include abuse/neglect reporting and investigation, citizen monitoring, case management, community options/owning own homes, choice making/self advocacy, and safeguards against harm. August 1992.

New Mexico Protection and Advocacy Inc. Monitored 90 class members *of Jackson v. Ft Stanton* who were at significant risk of harm due to complex medical needs and/or behavior difficulties. Analyzed monthly progress reports and provided interdisciplinary teams technical assistance in program design. These individuals resided at two institutions-Los Lunas State School & Hospital and Fort Stanton State School & Hospital. 1991-1992.

Maryland Disability Law Center. Accompanied a representative from the governor's office and state department of health officials on a tour of Great Oaks Developmental Center for the purpose of discussing concerns about facility conditions, placement planning practices, and community program alternatives. Settlement May 1992.

Central New York Legal Services. Evaluated conditions and adequacy of programs for persons with a dual diagnosis of mental illness and mental retardation at three (3) psychiatric facilities in upstate New York. April 1992.

Maryland Disability Law Center. Evaluated the Maryland developmental disability services quality assurance system. Visited community programs and public institutions and met with health department inspectors and officials and representatives from the governor's office and the office of the attorney general. Developed a plan of correction that became the foundation of a settlement agreement. Fall of 1991

App - 934

Alabama Protection & Advocacy for the Mentally Ill. Evaluated the quality of conditions at one facility and the system wide discharge planning process in the matter of *Wyatt vs. King*. September 1991.

Court monitor's office *in Arnold vs. Maricopa County, Arizona,* Reviewed adequacy of defendant's quality assurance plan for services for persons with mental illness and provided comments. August 1991.

Texas Advocacy Inc. in *Lelsz vs. Kavanagh*. Evaluated the adequacy of habilitation for nine (9) individuals who are developmentally disabled and who have mental health needs. Settled with appropriate placement and mental health services. June 1991.

American Civil Liberties Union in the matter of *Wilder et al v. Berstein et al,* U. S. District Court, Southern District of New York. Recommended Plan of Implementation concerning the revision of the New York City child welfare system because of its discriminating placement practices due to religion, race and handicapping conditions. April 1988.

Special Master, the Court of Honorable Barefoot Sanders in the matter of *Lelsz et al. v. Kavanaugh, et al.,* Civil Action No. CA-3-85-2462-H, United States District Court, Northern District of Texas, Dallas Division. Testified July 1987 and cited in opinion, February 1986-July 1987.

Connecticut Department of Mental Retardation. Design of a comprehensive quality assurance system, August-December 1986.

Connecticut Department of Mental Retardation. Participated in the development of a comprehensive community based system to include: residential programs, integrated day programs, community support services, placement procedures, case management and quality assurance. September 1984.

Connecticut Protection and Advocacy "Adequacy of Evaluation methods used to determine types of adaptive equipment and habilitation and training programs needed by individuals with complex medical and behavioral needs." December, January 1983.

Arizona Department of Mental Retardation and Attorney General *State of Arizona v. Lehmann,* Pima County, Arizona Superior Court. Evaluation of community living program for an adult accused of being inappropriately released from an institution because of a behavioral incident occurring in the community. November 1982.

Hansen and Ligi Law Offices, New Orleans in *Ramos v. Ramos and State of Louisiana.* Design of Court order compelling father to allow independent professionals to evaluate young adult with hydrocephalus and limited motor skills for purpose of designing a community living arrangement alternative. November 1982.

Lorraine Manor Nursing Home Management -Special evaluation of Lorraine Manor Nursing Home and recommendations to improve services for persons who are mentally retarded and have complex medical needs, Hartford Connecticut 1980.

Sue A. Gant, Ph.D.                    Curriculum Vitae
Page 13 of 23                         May 10, 2011

---

Special Master, *Gary W. v. State of Louisiana*. Development of Court order implementation monitoring system. Baton Rouge, Louisiana. 1980.

Connecticut Association for Retarded Citizens. Evaluation and program planning requirements for persons who are severely and profoundly retarded. Hartford, Connecticut 1979.

Connecticut Protection and Advocacy Services. Special evaluation of adequacy of individual assessments and program plans for persons with complex medical needs, severe physical disabilities and mentally retarded, Lorraine Manor Nursing Home. Hartford, Connecticut 1979.

Parent of Down Syndrome child to provide developmental assessment and consultative services to child (7 years old) in designing his Individual Education Plan to reflect his needs as required by Education Law P.L. 94-142. Hartford, Connecticut 1979.

Willowbrook Review Panel under the general direction of the Review Panel's Executive Director. Directed the activities of four New York State staff from the New York Office of Mental Retardation and Developmental Disabilities. Conducted program evaluations at three State developmental centers for the purpose of determining compliance with the Willowbrook (**NYARC v. Carey**) Consent Judgment, September 1978.

## Special Master and Court Monitor (• indicates trial or deposition testimony)

| | |
|---|---|
| April 1995-<br>February 2000 | Court Monitor *United States of America v. State of Oregon, et al., Civil Action No. 86-961-MA, U.S. District Court, District of Oregon.* |
| •December, 1993<br>September 1994- | Special Master *Halderman et al. v. Pennhurst et al.*, Civil Action No. 74-1345, U. S. District Court, Eastern District of Pennsylvania. Evaluated compliance with community placement requirements and made recommendations to the Court. |
| •November 1990-<br>May 1991 | Special Master in *Halderman v. Pennhurst* in response to a contempt motion filed by plaintiffs. After a trial the defendants (City of Philadelphia & Commonwealth of Pennsylvania) were found to be in contempt of the 1978 Settlement Agreement. |
| January 1980 -<br>January 1987 | Special Master *Gary W. et al. v. State of Louisiana et. al.*, Civil Action No. 74-1365, United States District Court, Eastern District of Louisiana. |

## Expert To The Court

| | |
|---|---|
| December 2007 -<br>Present | *Jackson et. al. vs. Fort Stanton et. al.*, Civil Action No. 87-0839, United States District Court for District of New Mexico, Honorable James P. Parker. |
| •May 1989-July<br>1989 | *Lelsz et al. v. Kavanagh, et al.*, Civil Action No. C.A.-3-85-2462 A, U. S. District Court, Northern District of Texas, Dallas Division, Honorable Barefoot Sanders. |

| •April 1988 - October 1988 | *Halderman et al. v. Pennhurst State School and Hospital et al.,* Civil Action No. 74-1345, U. S. District Court, Eastern District of Pennsylvania. (Compliance review in community settings.) Honorable Raymond Broderick |
| 1979-1980 | *Gary W. et al. v. State of Louisiana et al.,* Civil Action No. 74-1365, United States District Court, Eastern District, Expert Consultant, Appointed Special Master. |
| •December 1982-January 1983 | *Hilburn et al v. Commissioner, Connecticut Department of Income Maintenance (Mahr).* U. S. District Court, Connecticut "Appointment of a Special Master and design of an evaluation process to determine types of adaptive equipment and training programs for individuals with complex medical and behavioral needs." |
| •September 1980-May 1991 | *B.H. et al., v. Johnson,* Illinois Department of Children and Family Services, Civil Action No. 88-C-5599, United States District Court, Northern District of Illinois, Eastern Division. |
| 1978-1980 | *NYARC et. al., v. Carey, United* States District Court, Eastern District of New York. Honorable John Bartells |

## Consultant United States Department of Justice

| 2010 | United States v. Georgia, Case No. 1:-10-CV-249-CAP (January 28, 2010), Prepared Declaration for Hearing; Landmark Settlement to resolve the unlawful segregation of individuals with mental illness and or developmental disabilities in state-run psychiatric hospitals. In a compromise, Georgia agreed to development of additional DD community services and offer a range of community services for 9,000 people with serious mental illnesses. |
| 2010 | United States v. Georgia, Case No. 1:-10-CV-249-CAP (January 28, 2010), Assessed State's efforts to comply with the American's Disability Act with regard to persons residing in 5 State Hospitals (ADA); evaluated Georgia's community capacity to accommodate persons from State Hospitals; evaluated sample of Medicaid Home and Community Based Waiver funded community homes; met with individuals living successfully in homes of their own, and families in support of community integration. |
| 2010 | United States v. Georgia, Case No. 1:-10-CV-249-CAP (January 28, 2010), Assessed State's efforts to comply with the American's Disability Act with regard to persons residing in 5 State Hospitals (ADA); focusing on health, safety and welfare; Federal investigation began after more than 100 suspicious deaths of patients in state mental hospitals were documented over a five-year period. |
| 2010 | United States v. Georgia, Case No. 1:-9-CV-119-CAP (January 15, 2009), Evaluated adequacy of Georgia's Quality Management Plan. Conference |

App - 937

|  | with Department of Justice and Bazelon Center for Mental Health Law attorney's to review evaluation findings and recommendations. |
|---|---|
| 2010 | United States v. Georgia, Case No. 1:-9-CV-119-CAP (January 15, 2009), monitored defendant's compliance with the Court Adopted Settlement Agreement focusing on appropriate community integration, discharge planning, quality community services; Georgia's community capacity; |
| 2010 | Expert consultant in the development of quality assurance systems and risk management, standards of care: treatment planning and service delivery, behavior support services, discharge planning and community integration in USDOJ cases under investigation. |
| October 2009 | United States v. Georgia, Case No. 1:-9-CV-119-CAP (January 15, 2009), Evaluated compliance with Global Settlement Agreement at Southeast Regional Hospital-a facility for individuals with developmental disabilities and a psychiatric facility in Thomasville, Georgia; school age and adults |
| August 2009 | United States v. Georgia, Case No. 1:-9-CV-119-CAP (January 15, 2009), Evaluated compliance with Global Settlement Agreement at Greater Atlanta Regional Hospital-a facility for individuals with developmental disabilities and a psychiatric facility in Atlanta, Georgia; adolescents and adults |
| May 2009 | United States v. Georgia, Case No. 1:-9-CV-119-CAP (January 15, 2009), Evaluated compliance with Georgia Global Settlement Agreement at East Central Regional Hospital-a facility for individuals with developmental disabilities (Gracewood) and a psychiatric facility in Augusta, Georgia school age and adults |
| March 2009 | Working draft: Texas Global Settlement Agreement involving 13 Texas facilities; Provided consultation: Requisites of Quality and Risk Management Systems-Facility and Statewide |
| October 2008 | Evaluated conditions and discharge planning at Rosewood Developmental Center, Owings Mills, Maryland, a facility for adults with developmental disabilities. |
| June 2005 | Evaluated conditions and discharge planning at Lubbock, Texas Developmental Center, a facility for 344 individuals (school age and adults) with developmental disabilities. |
| June 2000-2007 | Evaluated the effectiveness of discharge planning and quality of community placement for a select number of former residents of Fort Wayne State Developmental Center and at Muscatatuck State Developmental Center in Indiana. Also provided the Indiana Family and Social Services Administration with recommendations for improvement of the Indiana community service system for Indiana citizens with developmental disabilities. Conducted numerous facility and community tours ( average 2 tours per year, visiting approximately 20 individuals each year in their community residence and day program), monitoring |

|  |  |
|---|---|
| | implementation of the Strategic Plan attached to the United States and Indiana Settlement Agreement. |
| January 1999-2002 | Evaluated conditions and discharge planning at Rainier State Developmental Center (480 person institution) and at Francis Haddon Morgan Center (55 persons) in Washington. Participated in discussions with Washington officials and representatives of USDOJ regarding corrective actions. |
| October 1998-March 2007 | Evaluated service quality and discharge planning at Fort Wayne State Developmental Center (437 person institution) and at Muscatatuck State Developmental Center (383 persons) in Indiana. The Indiana Family and Social Services Administration and USDOJ agreed to have me complete the evaluations and make recommendations for improvements. MSD closed March 2004 and FWSDC closed June 2007. Conducted numerous tours of the facilities and provided consultation in methods to improve quality. |
| July 1998-2000 | Evaluated the effectiveness of discharge planning and quality of community placement for a select number of former residents of New Castle State Developmental Center (NCSDC), New Castle, Indiana; also provided the Indiana Family and Social Services Administration with recommendations for improvement of the Indiana community service system for Indiana citizens with developmental disabilities. |
| May 1998 | Evaluated Indiana's implementation of a community placement plan involving 165 persons residing at NCSDC and also assessed the quality of services for those individuals remaining at NCSDC. |
| October 1997. | Conducted an evaluation of (NCSDC), a 165-bed facility for persons with developmental disabilities. |
| March 1995. | Participated in negotiations between the parties and helped draft a stipulated agreement in the matter of *United States of America v. State of Oregon* regarding protection from harm of individuals residing at Fairview Training Center, a public institution. |
| August 1994 | Evaluated service quality in a public ICFMR (Fairview Training Center) to determine compliance in the manner of *United States of America v. State of Oregon*. A report and recommendations for protection from harm became the basis for additional remedy in this protracted (1986 consent order) litigation. |
| •June 1994. | Evaluated the adequacy of the defendant's and the court monitor's remedial plan to correct constitutional violations in *United States of America v. State of Tennessee*. |

## System Reform Expert: Health and Safety, Active Treatment, Discharge Planning, Community Integration and Quality Assurance

•2006-2009    *Ligas et al., vs. Maram,* No. 05-4331 Class Action, United States District Court For The Northern District Of Illinois, Eastern County. (Individuals with intellectual and/or developmental disability residing with family, in community congregate settings, or segregated institutions waiting for Medicaid Home/Community Based Waiver (HCBW) funded services. Evaluated needs of a sample of individuals eligible for HCBW services.

•2005-2009    *Capitol People First, et al., vs. Department of Developmental Services,* Case No. 2002-0387156, Superior Court of the State of California, Alameda County. (Individuals with intellectual and/or developmental disability residing with family, in community congregate settings, or segregated institutions waiting for Medicaid Home/Community Based Waiver (HCBW) funded services.) Evaluated needs of a sample of individuals eligible for HCBW services; adequacy of California's planning policies, and resource development. Provided remedial recommendations.

•2005    *ARC Connecticut et al., v. O'Meara, 3:01 CV 1871 (JBA),* United States District Court for District of Connecticut. Fairness Hearing. Provided Court testimony involving an assessment of the fairness of the community services provisions of a proposed settlement agreement.

2003-2004    *ARC Connecticut et al., v. O'Meara, 3:01 CV 1871 (JBA),* United States District Court for District of Connecticut. (Individuals with intellectual and/or developmental disability residing with family, in community congregate settings, or segregated institutions waiting for Medicaid Home/Community Based Waiver (HCBW) funded services. Evaluated community service system (residential, case management, health and therapies, employment) capacity.

2004-2006    *Rolland v. Cellucci, et. al,* Civil Action No. 98-30208-KPN, United States District Court for District of Massachusetts. (Individuals with developmental disabilities residing in nursing facilities, who lived in nursing facilities on or after a date certain or should be screened for admission to nursing facilities pursuant to federal requirements. Individuals with mental retardation/ developmental disabilities in nursing homes are entitled to federally defined active treatment.)

•1998-July 2000    *Wolf Prado-Steiman, et. al, vs. Jeb Bush, et. al.,* Case No. 98-64-96-CIV, Ferguson, United States District Court, Southern District of Florida, Fort Lauderdale Division. (20,000+ individuals with developmental disabilities eligible for services funded by Medicaid Home and Community Based Waiver.)

•1996-2010    *Messier vs. Southbury Training Center,* Civil Action No. (one institution) Trial testimony: Active Treatment, placement planning, discharge process, case management, community services capacity; Provided Court testimony

at Remedial Relief Hearing.

| January 1989-May 1990 | *Kope et. al. vs. Watkins et. al.,* Civil Action No. 88-61424-CZ, State of Michigan Circuit Court for the County of Ingham. (3 nursing homes; health and safety; conditions) |
|---|---|
| April 1990-January 1995 | *Jackson et. al. vs. Fort Stanton et. al.,* Civil Action No. 87-0839, United States District Court for District of New Mexico. (2 institutions) |
| 1994-1996 | *Botello v. Las Vegas State Hospital,* United States District Court for District of New Mexico. (6 patients with dual diagnosis of mental retardation and mental illness) |
| October 1988-May 1991 | *Conner v. Branstad,* Civil Action No. 86-871-B (S.D. Iowa) and *Barker v. Branstad,* Civil Action No. 86-989E (S.D. Iowa) United States District Court, Southern District of Iowa, Central Division. (2 institutions) |
| October 1990-August 1991 | *Brown v. Northern Virginia Training Center,* United States District Court. Abuse of a male resident. |
| 1982-1984 | *Connecticut Association for Retarded Citizens v. Thorne,* United States District Court for District of Connecticut. (1 institution, participated in design of consent decree and implementation plan) |
| 1979 | *Dober v. Lorraine Manor Nursing Home* for Connecticut Protection and Advocacy Center, Health and Safety; Specialized Therapies for Medically Challenged Adolescents and Young Adults with Developmental Disabilities. |

## Program Services/Standard of Care Expert

| •2010-Present | *Foster v. Bridges...A Community Support System, Inc.,* Superior Court of New Haven, Connecticut, Personal Injury, involving man with intellectual/developmental disabilities and psychiatric illness. |
|---|---|
| •2009-2011 | *Arpino v. Marrakech and DMR,* Superior Court of New Haven, Connecticut, Wrongful death of a man with developmental disabilities living in a community home. |
| •2007-2008 | *Cochran v. Progressive Horizons, Inc.,* Circuit Court, Baltimore County, Maryland, Case No.: 03-C-06-002182 Wrongful death of a man with developmental disabilities living in a community home. |
| •2006-2009 | *Braden v. A.R.I.E.S. (Starlight Group Home),* State of Arizona Wrongful death of a man with developmental disabilities living in a community facility. |
| •2006-2009 | *Estate of Timothy Sellers v. Tungland Corporation, et al.,* Maricopa County Superior Court, Arizona, No. CV2006-000896 Arizona. Wrongful death of a man with developmental disabilities living in a community facility. |
| •2005-2007 | *The Estate of Michael Root by Harriet Crockett v. Secure Care Services LTD,* Health Care Alternative Dispute Resolution Office of Maryland. Wrongful |

Curriculum Vitae  
May 10, 2011

death of a man with developmental disabilities living in a community facility.

- •2005-2010  *Santaniello v. Sweet et. al.*, United States District Court, District of Connecticut, No. 3:04CV806 (RNC), Personal injury of woman living in community home.

- •2005-Present  *Harvey, et al., v. Mohammed, et al.*, United States District Court, District of Columbia, Case No. 1:02-CV-2476. Wrongful death of a man with developmental disabilities living in a community facility.

## Program Services/Standard of Care Expert

- •2010-Present  *Foster v. Bridges...A Community Support System, Inc.*, Superior Court of New Haven, Connecticut, Personal Injury, involving man with intellectual/ developmental disabilities and psychiatric illness.

- •2009-2011  *Arpino v. Marrakech and DMR*, Superior Court of New Haven, Connecticut, Wrongful death of a man with developmental disabilities living in a community home.

- •2007-2008  *Cochran v. Progressive Horizons, Inc.*, Circuit Court, Baltimore County, Maryland, Case No.: 03-C-06-002182 Wrongful death of a man with developmental disabilities living in a community home.

- •2006-2009  *Braden v. A.R.I.E.S. (Starlight Group Home)*, State of Arizona Wrongful death of a man with developmental disabilities living in a community facility.

- •2006-2009  *Estate of Timothy Sellers v. Tungland Corporation, et al.*, Maricopa County Superior Court, Arizona, No. CV2006-000896 Arizona. Wrongful death of a man with developmental disabilities living in a community facility.

- •2005-2007  *The Estate of Michael Root by Harriet Crockett v. Secure Care Services LTD*, Health Care Alternative Dispute Resolution Office of Maryland. Wrongful death of a man with developmental disabilities living in a community facility.

- •2005-2010  *Santaniello v. Sweet et. al.*, United States District Court, District of Connecticut, No. 3:04CV806 (RNC), Personal injury of woman living in community home.

- •2005-Present  *Harvey, et al., v. Mohammed, et al.*, United States District Court, District of Columbia, Case No. 1:02-CV-2476. Wrongful death of a man with developmental disabilities living in a community facility.

## Professional Affiliations

Association For Positive Behavior Support 2007-Present.

International Association of Forensic Nurses (IAFN) 2006-Present.

Association of Qualified Mental Retardation Professional 2005-Present.

American Association on Intellectual and Developmental Disability (AAIDD) formerly (AAMR) 1977 - Present.

The Association for Persons with Severe Handicaps (TASH), 1977 - Present.

National Association of Persons with a Dual Diagnosis (NADD), 1995-Present.

Association for Advancement of Behavior Therapy, 1982 - Present.

The Arc: For People with Intellectual and Developmental Disabilities (The Arc), 1970 - Present.

## Publications

Gant, S.A., (1990), *The Connecticut Experience* in V.J. Bradley and H.A Bersani (Eds.), Quality Assurance for Individuals with Developmental Disabilities: It's Everybody Business (pp. 301-321). Baltimore, Maryland: Brooks.

**Doctoral Dissertation** titled, *A Validation and Reliability Study of the Anna Behavioral Profile*, 1978.

**Publication** in Adapted Physical Activity Quarterly, volume 1, number 2, 1984. Camden, J. E., Wright, J., Gant, S.A., *Gary W. et al v. State of Louisiana: Implications for Adapted Physical Education, Recreation, and Leisure*.

**Doctoral Specialty Paper**, *The History of Terminology and Classification Schemes of Mental Retardation*, 1977.

## Additional Education

| | |
|---|---|
| June 2010 | Neurologic Care: A Multidisciplinary Approach. NADD |
| March 2010 | Death Investigations; International Forensic Nurse Association |
| December 2009 | Mortality Review and Death Investigations: Aboud & Associates Inc., Austin, Texas. |
| October 2007 | Combining Functional Behavioral Assessment and Social-Communication Interventions: Addressing Developmental Disabilities in Autism Spectrum Disorders. NADD |
| September 2007 | Diagnostic Manual-Intellectual Disability (DM-ID): A Textbook of Diagnosis in Persons with Intellectual Disability published by NADD/APA. NADD. |
| September 2006 | Crisis Prevention and Intervention for Adults with Autism: The Team Centers, Inc. Chattanooga, Tennessee. NADD |
| October 2006 | The Medically Fragile Patient: Management of Seizure Disorders, Diagnosis and Treatment of Dysphagia, Characteristics and Management of Digestive Disease: St. Mary's Hospital and Mayo Clinic, Rochester, MN. |

| | |
|---|---|
| March 2006 | Injury Analysis. Dan Sheridan, John Hopkins University. |
| March 2006 | New Medicines in the Developmental Disabilities Field. NADD Symposium |
| November 2005 | Dysphagia and Risk Management Training Institute: John Hopkins |
| December 2003 | Inclusive School Renewal: Creating Effective Schools for All Students Symposium. (TASH) |
| September 2002 | Psychiatric Disorders in Children and Adolescents with Mental Retardation and Autism Spectrum Disorders. NADD |
| July 2001 | Pharmacotherapy of Psychiatric Disorders in MR/DD Population, with a Focus on Some Unique Diagnostic and Treatment Challenges, NADD Training Institute. |
| July 2001 | Demystifying Physical Health Causes and Behavioral Health Symptoms. NADD Training Institute, Lancaster, PA. |
| June 2000 | Advanced Directives: An Important Legal, Ethical, and Clinical Issue for People With Severe Developmental Disabilities and Complex Medical Problems. (AAMR) |
| June 2000 | Understanding Swallowing Problems (Dysphagia and Aspiration) in Adults with Mental Retardation. Symposium |
| May 2000 | Diagnosis and Treatment of Psychiatric Disorders in Persons with Developmental Disabilities and Genetic Syndromes. NADD Training Institute. |
| May 2000 | Reducing Abuse and Use of Restraints, Health Care Financing Administration (HCFA). |
| May 2000 | Approaches to Assuring Optimal Health for Individuals with Disabilities. Symposium |
| May 2000 | Positive Approaches and the Reduction of Behavioral Incidents in Persons with Mental Retardation, YAI/National Institute for People with Disabilities, NY, NY. |
| June 1999 | The Psychiatric Evaluation and Treatment of Persons with Mental Retardation and/or Autism. University of Medicine and Dentistry, Princeton University, Princeton, New Jersey. |
| June 1995 | International Conference of Psychopharmacology and the Developmentally Disabled, Participant, outcome was publication of The International Consensus Handbook: Psychotropic Medications and Developmental Disabilities, Nissonger Center for Mental Retardation and Developmental Disabilities, Ohio State University. 1998. |
| June 1994 | "Drug reactions and behavioral symptomtolgy from a clinical pharmacological perspective," University of Oklahoma. |
| June 1994 | "Measuring Quality in a Mental Health System". Workshop by Court |

|  |  |
|---|---|
|  | Monitor in Washington DC *Dixon* case. |
| June 1994 | Methods used to evaluate and analyze injuries; Implementing a system to measure adverse effects of institutionalization of persons who are developmentally disabled and who have unmet mental health needs. System used in the *Thomas S.* North Carolina case. |
| June 1993 | "Polypharmacy impact of integration of people with disabilities into community and family practices", University of Oklahoma. |
| June 1993 | Outcome measures and new standards developed by the National Accreditation Council of Programs for Persons with Developmental Disabilities. |
| May 1993 | The new definition of mental retardation developed by the American Association of Mental Retardation (AAMR). |

## Other Activities

Iowa local and South Dakota Regional Multi-Cultural Community Meal Volunteer 2010-Present

Senior Companion to Medicaid Elder Waiver recipients, NW Iowa Department of Aging-2010-Present

Community Advisor, Siouxland Palliative Care 2010-Present

Support member for individuals receiving Hospice (Siouxland) care and their caregivers. 2005-Present

Guardian or medical power of attorney, medical case manager and in home caregiver of 3 family elders with variety of diagnoses: Alzheimer's disease, dementia, physical disabilities, compromised respiratory function, cardiovascular issues, congestive heart failure, and visual impairment/blindness due to macular degeneration. Support and accommodations with supplemental services from Medicaid Elder Waiver, Assisted Living, Palliative and Hospice Care to maintain quality of life while staying in own home. 2001-2010

Virgin Islands Medicaid Reform Task Force Member. 1999-2001

In February, 1994 two colleagues, a doctorate of social work and family practice and a school nurse, and I developed a training program for teachers and parents regarding alternatives to "Hitting, Spanking, Shaking". This program has been provided to schools and churches in the Virgin Islands.

I was a founding member of the St. John Safety Zone and the Virgin Islands Child Abuse and Neglect Task Force and continued to be active in victim counseling and domestic violence prevention activities from September, 1992-November 2001. I co-authored the V.I. statue defining child abuse and reporting requirements.

I served as a member of the Virgin Island Governor's Council for Maternal and Child Health Care and assisted the Virgin Islands Health Department develop the assessment strategy and analyze the results for the 1996 - 2000 V.I. Health Care Plan for children with special needs. This plan was completed as required by a grant from the U. S. Department of Health and Human Services.

App - 945

Sue A. Gant, Ph.D.                    Curriculum Vitae
Page 23 of 23                          May 10, 2011

---

I volunteered as team facilitator of the St. John public elementary and middle school Improvement Plan. This plan was a community effort to implement "Developing Capable People" a values training curriculum.

I was a trained National Red Cross mental health counselor and volunteer of the V.I. Red Cross and V.I. Territory Emergency Management Agency. (VITEMA)

I assisted in the program development of a Conference for Federal Judges on Institutional/Community Disability Litigation sponsored by Foundation for Dignity, Philadelphia Resource Center for Developmental Disabilities. 1986.

I organized the Association for Special Masters and planned/chaired conferences: January 1984, Washington D.C.; November, 1984, Chicago Illinois; April 1985, Philadelphia, Pennsylvania, New Orleans December 1986, and Washington DC May, 1987.

I served as a member of the Advisory Board for Louisiana State University, School of Allied Health, Department of Rehabilitation Counseling, and the Community Living Institute. June 1984-1986.

I served as the chairperson for the First Annual Anna Colloquium, *An Applied Behavioral Approach to Training Severely/Profoundly Developmentally Disabled Vocational Skills*. Host: Southern Illinois University and Anna Developmental Center, 1978, Anna, Illinois.

In 1976 I developed a training procedure to increase social interaction and community learning skills with moderate and severely retarded adults. Diagnosis ranged from seizure disorders, 1 Klienfelder's Syndrome, Down's Syndrome and serious Cultural Familial Deprivation.

**SECTION: FINANCIAL EXPLOITATION (Excerpt of Report of Sue Gant, PhD.)**

**Intellectually Disabled Employees of Hill Country Farms, Inc. d/b/a Henry's Turkey Service, Are Victims of Financial Exploitation**

HCF/HTS recruited workers with intellectual disabilities to come work across state lines presumably to improve the profitability of their company, HCF/HTS. Defendants exploited the workers with disabilities because they knew they could because of the workers' disability. Kenneth Henry testified in his 5/12/12 deposition, he doubted any of the workers with a disability would or could file a complaint of discrimination.

Typically, if a company is recruiting people to their company, the company is looking for specific skills, experience, knowledge, characteristics etc. HCF/HTS deliberately employed a class of workers that were vulnerable, disenfranchised, and strong, "not loud" and with no home and no work. These characteristics are what made these workers so attractive when HCF/HCT put them to work.

Kenneth Henry testified on 4/26/10 in an administrative hearing in the state of Iowa, that the Iowa processing plant at Louis Rich (later transferred to West Liberty Foods) was to fill positions (slots) with a worker that could (and, of course, would be willing and easily controlled) to do any job. HCF/HTS simply objectified these workers with a disability by charging for their productivity but not recognizing their personal contribution with a fair/equitable wage comparable to their co-workers without a disability. Defendants failed to pay the worker victims a fair wage commensurate with their productivity.

In deposition Kenneth Henry testified the rate of pay for the workers with a disability was set "40 years ago". Henry reported the pay for HCF/HTS employees without a disability, was different in that the hourly rate was negotiated with the employee and pay differed each month depending on the number of hours worked and type of job.

State and federal agencies and courts have determined that defendants denied the aggrieved workers rightful manner and amount of compensation and in some of the following ways:

- HCF/HTS failed to provide wage statements;
- HCF/HTS failed to provide minimum wage;
- HCF/HTS made improper wage deductions for room and board;
- HCF/HTS made improper wage deductions for room and board; and
- HCF/HTS made improper wage deductions for "kind care."

HCF/HTS workers with a disability were at least, if not more, productive than their co-workers without a disability. Even after recruiting and keeping the workers with a disability at HCF/HTS for almost 40 years, there were no performance enhancements, additional training or job restructuring to improve the workers performance (and presumably their wages to advance self sufficiency) over the years.

1

App - 947

Dan Waters, Vice President of West Liberty Foods testified at the Department of Labor trial the worker victims were productive. When comparing the workers that replaced the HCF/HTS worker victims, HCF/HTS's workers were more productive, Mr. Waters opined, " Henry's workers did a better job than the replacements." The West Liberty plant employed 600-700 workers according to Waters. However, unlike the worker victims, the West Liberty replacement worker's were paid higher than minimum wage.

According to testimony by Dan Waters of West Liberty Foods, during the Iowa Department of Labor trial, 4/26/10, West Liberty paid HCF/HTS $10, 000-$11, 000 per week for work performed by the HCF/HTS workers with a disability.

Kenneth Henry testified in deposition 5/12/12 that he and Jane Ann Johnson each were drawing a salary from HCF/HTS of $600 a week. Conversely, the workers with a disability were paid no more than $65 a month for decades, regardless of their productivity.

HCF/HTS, accountant and corporate officer, Robert Berry, testified in deposition that HCF/HTS received revenues of over $500,000 a year from West Liberty Foods.

HCF/HTS Supervisor, Dru Neubauer, explained during her 5/16/12 deposition that the prescribed process she followed to "pay" the workers with a disability was established before she worked for HCF/HTS. Ms. Neubauer reported that she distributed the checks sent by Jane Ann Johnson; each workers check total amount for the month, after deductions, was $60.03. The amount never changed. After the workers with a disability signed the check; she then took the signed checks to the bank, cashed the checks, brought the money back, put the money in the safe and then every week would distribute what money the workers with a disability had for spending money.

She testified she asked company President TH Johnson and Vice President Kenneth Henry why the workers with disabilities were only receiving $60 a month, but was told it was none of her business. She never asked Jane Ann Johnson about it.

Dru Neubauer described in her deposition 5/16/12 how the men were paid -Each worker with a disability had an envelope she had made for them; They received $30.03, in the middle of the month and every Thurs after they got $10 unless there were 5 weeks in the month then $10 was split in half. They got $5 and $5. The workers with a disability were paid $5 on Tuesday of every week. The amount was $65 all those years- it never changed regardless of how many hours the men with disabilities worked every week. Ms. Neubauer testified that it did not surprise her that the men did not know what was coming out of their paychecks and they didn't know what they were signing.

Defendants failed to fulfill their duty as employer to pay a fair wage to its workers. Instead, Defendants paid only a fraction of the minimum wage. HCF/HTS owners profited off of the labor of the disabled workers. The company provided -

- No education to inform the workers with disability what their rights are and what the options are for employment.
- No training to maximize employee skills and properly evaluating workers for wage

increases.

Men were subjected to discriminatory practices based on severity of disability.  Less disabled men received preferential treatment.

Henry's treated its employees with disabilities differently than Henry's nondisabled employees.

Nondisabled employees:
- Were paid an hourly minimum wage or better; Disabled workers were paid $65 a month; the amount of wages did not change for decades; West Liberty Management and supervisors were satisfied with the work the men with disabilities performed; Randy Neubauer testified he was very proud of the way the men performed and developed their skills over time; over a 35 year period men became very proficient in their ability to perform required work tasks; West Liberty paid Henry's 10-$11,000 a week for the work of Henry's workers with an intellectual disability;
- Had no payroll deductions for room and board;
- No in kind deduction;
- No wage credit;
- No deduction for transportation;
- Had a choice of housing;
- Had a choice of where and when to eat;
- Could leave Atalissa area any particular given time when not on the clock;

HCF/HTS also had a conflicting interest as their Social Security Representative Payee ("rep payee").  HCF/HTS officer, Jane Ann Johnson, was the organizational rep payee designee for all the HCF/HTS workers with a disability.

## HCF/HTS as Social Security Representative Payee Exploited Workers With Intellectual Disabilities

HCF/HTS was the organizational Social Security Representative Payee (SSRP) for the aggrieved workers with disability without the worker victim's informed consent and without informing the workers about their benefits.

On February 5, 2009 the sister of Keith Brown an aggrieved individual, complained to Iowa DHS that her brother, a HCF/HTS worker with disabilities and his co-workers were required to turn over their SSI checks in exchange to work at the turkey plant and live at the bunkhouse.

Mr. Brown's sister reported how Dru Neubauer called to inform her that Jane Ann Johnson and Kenneth Henry wanted her to call to determine if KB's family was interested in having Keith Brown come home because HCF/HTS had decided to close the Atalissa operation with a gradual return of all the workers with a disability to Texas. Ms. Brown explained she did not have the financial means to take care of her brother and could not get an answer from Neubauer as to the amount of Keith Brown's earnings or social security. Keith Brown did not know about his money and complained how he only received $65 a month. Ms. Brown then contacted the Social Security

3

App - 949

Administration and learned that not only was HCF/HTS Keith Brown's employer but also his SSI Representative Payee.

At the time of the rescue of the aggrieved workers from the defendants in February 2009, Dru Neubauer reported to the HSD caseworkers, financial concerns. She had been noticing "the boys" (a demeaning reference, considering all the men with ages ranging from 40's to 80 years old) were not getting paid because of all the overtime, and only getting paid $5 on Tuesdays, $10 on Thursday and $60 one time a month, but getting to keep only $30 of it.

HCF/HTS had a dual role and a profound conflict of interest as both employer and rep payee. Each had specific duties for each of these roles. As employer, they were bound by FLSA and the ADA, to pay fairly for the work performed. As rep payee, HCF/HTS had a duty to make sure that the people they represent, are not exploited by their employer, residential or other support entities, etc.

Defendants, namely Jane Ann Johnson, grossly neglected the role and responsibilities of a SSRP with the following omissions and co-missions:

> Failed to spend benefits to help create a stable living environment for the beneficiary;
> - Did not ensure that the basic current needs of food, shelter, clothing, and medical care were met. □
> - Once current needs were met, did not save any leftover funds for the men's future use;
> - Did not help motivate the men to work toward more independent living; and
> - Disregarded the men's need for therapy and rehabilitation.
> - Failed to arrange for financial benefits counseling for the men/employees with disabilities whom they were their rep payee; and
> - Failed to pursue the many work incentives available to assist the men with disabilities to have a good job and not lose their benefits.[1]

If HCF/HTS had been a trustworthy employer and rep payee and with very little effort- as the employer- they could have simply paid the workers with disabilities fairly and what everyone else was paid and also pay for their benefits; or as rep payee, look into ways of preserving the benefits of their workers with intellectual disabilities. Instead, HCF/HTS was only interested in profits and using the workers as virtual slave labor. The defendants' omissions and commissions that promoted decades of peonage of workers with disabilities for employee gain was so grossly unfair, it is unconscionable.

The Defendants conduct including acts of deliberate misrepresentation of the individuals' wages and expenditures deprived the workers with a disability economic independence and self-sufficiency. HCF/HTS (TH Johnson, Jane Ann Johnson and Kenneth Henry) took advantage of the workers with a disability knowing that they would not likely be discovered because the workers were disabled.

---

[1] As a frame of reference, there are hundreds of thousands of people on SSI who are arguably more disabled than the aggrieved plaintiffs who are making good wages, some of whom are running their own businesses.

If it had not been for the death of TH Johnson and the aging of his widow, Jane Ann Johnson and HCF/HTS officer Kenneth Henry, and the deteriorating health and advanced age of the workers with disabilities, the HCF/HTS scheme to defraud the aggrieved workers with disability of their wages, would most likely be operational today. It was only because HCF/HTS wanted to retire the Iowa operation and dispose of the braceros with disability who were no longer "strong arms," were the enslaved workers with disabilities rescued.

HCF/HTS's charade created a class of citizens (workers with intellectual disability) permanently dependent on public benefits and subsidies, because their pay was less than the minimum wage and provided no benefits. Earning at least the minimum wage, if not a living wage, would have allowed the workers with disabilities to support themselves and reduce the amount of aid they receive from government sources. It is apparent that some of those government supports were never provided to the men as their access was controlled by the employer. HCF/HTS's acts and omissions prevented workers from ever escaping a life of poverty.

Defendants' unfair wages to the workers with disability kept them in a life of perpetual poverty and dependency. Defendants' intentional acts kept the workers dependent on HCF/HTS to meet their basic needs of food, shelter, and medical care, preventing them from achieving independence. By not paying the workers fair wages commensurate with their productivity, HCF/HTS directly impacted the disabled workers' capacity to live a full, rich life as an active, tax-paying member and employee of the workforce and the community.

Through interviews with the worker victims by way of example:

None of the aggrieved workers could tell me how much money they made at the turkey plant. The common answer was "5 dollars". When asked, what was their hourly wage, the consistent response was "5 dollars". The aggrieved workers told me they did not have bank accounts in Iowa when they worked at West Liberty and lived in the bunkhouse. They reported they "hid" their money in their locker, under their mattress, or in their pillow so "Nobody will steal it." When asked if they had any money saved they emphatically and some angrily stated they did not have any and added that the money had been "stolen" from them.

The aggrieved worker's intellectual disability and limited educational experiences impact their ability to fully and accurately understand financial accounting. Limited functional skills related to few experiences to spend money has also caused the aggrieved workers impaired money management skills. It is for all these reasons that the workers with a disability required a rep payee. However, their rep pay used their disability as a tool to discriminate against the aggrieved workers.

For all of the above reasons, I find that the employer-employee relationship between HCF/HTS and the 32 disabled workers represented by the U.S. Equal Employment Opportunity was one in which the employees were exploited with regard to their employment and wage compensation. The employer engaged in pay practices, which had long proven to benefit the employer to the detriment of the interests of the disabled employees who were kept unaware of the nature and extent of the irregularities with respect to their wages, income and funds. Those employees of HCF/HTS who were not disabled were not subjected to the same economic disadvantages by the

App - 951

employer that the 32 disabled men suffered at the hands of HCF/HTS while they were with the company.

6